CHARLETTA HARWELL-PAYNE,

          Plaintiff,

                                    Case No. 21-cv-328-pp

  v.

CUDAHY PLACE SENIOR LIVING LLC,
and 41 MANAGEMENT LLC,

          Defendants.

---

**ORDER DENYING WITHOUT PREJUDICE DEFENDANTS' THIRD MOTION TO DISMISS (DKT. NO. 90), GRANTING PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION (DKT. NO. 94) AND DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTION TO CERTIFY CLASS (DKT. NO. 96)**

---

The plaintiff, a former employee of Cudahy Place Senior Living, LLC (Cudahy Place), a memory care facility, filed an individual, collective and class action in the Western District of Wisconsin under the Fair Labor Standards Act (FLSA), Wisconsin law and Federal Rule of Civil Procedure 23. Dkt. No. 1. In her first complaint, she alleged that defendants Cudahy Place and Matthews Senior Housing LLC, failed to properly compensate her for the time spent completing a temperature check and COVID-19 symptoms questionnaire at the beginning of her shift. Id. In addition, she alleged that she should have been compensated for any time she worked through all—or part—of her lunch break. Id. The defendants filed a motion to transfer to the Eastern District of Wisconsin, dkt. no. 5, and a partial motion to dismiss, dkt. no. 10, arguing that the temperature check and questionnaire were not intrinsic elements of

the defendants' principal activities and that any time spent on those activities was *de minimis*, dkt. no. 11 at 2.

The plaintiff filed an amended complaint on January 7, 2021, dkt. no. 23, then filed a motion for leave to amend the amended complaint, dkt. no. 25. Chief Judge Peterson of the Western District of Wisconsin granted the motion to amend by text only order dated January 13, 2021, dkt. no. 27; the second amended complaint appears at dkt. no. 28. On January 27, 2021, defendant Cudahy Place filed a second partial motion to dismiss, dkt. no. 29, an answer to the second amended complaint, dkt. no. 31, and another motion to transfer venue, dkt. no. 32. On March 15, 2021, Chief Judge Peterson granted the motion to transfer venue but did not rule on the second partial motion to dismiss. Dkt. No. 48. At the time of transfer, the Clerk of Court in the Western District closed the case and terminated all pending motions (including the undecided partial motion to dismiss, Dkt. No. 29).

The clerk's office in this district assigned the case to this court after one or more of the parties refused to consent to a magistrate judge's authority to issue a final decision. The plaintiff filed three motions: (1) a motion for leave to file a second amended complaint naming 41 Management LLC as a defendant, Dkt. No. 53; (2) a motion to determine the adequacy of the responses to the requests to admit, Dkt. No. 54; and (3) and a motion to certify the class, Dkt. No. 55. The parties briefed those motions, and the plaintiff filed a fourth motion, an expedited motion to submit supplemental authority. Dkt. No. 70. A

2

month later, the plaintiff filed a fifth motion—another motion to certify class. Dkt. No. 73.

On December 7, 2021, the court held a hearing and denied without prejudice the defendant's second partial motion to dismiss because defendant Cudahy Place had brought the motion on behalf of defendants who had not appeared or otherwise responded to the complaint. Dkt. Nos. 86, 89. The court also granted the plaintiff's motion for leave to file a second amended complaint (really a *third* amended complaint), denied without prejudice the plaintiff's motion to determine adequacy of responses to request to admit and denied the plaintiff's Rule 7(h) motion to submit supplemental authority. Id. With respect to the plaintiff's first and second motions to certify a class, the court explained that the plaintiff continued to "put the cart before the horse" by asking to certify a class against a defendant—41 Management—that had not appeared in the litigation. Id.

On December 8, 2021, the plaintiff filed its third amended complaint, adding 41 Management as a defendant. Dkt. No. 87. Two weeks later, defendants Cudahy Place Senior Living and 41 Management filed a third partial motion to dismiss, dkt. no. 90, and an answer to the third amended complaint, dkt. no. 92. On January 20, 2022, the plaintiff filed a motion for conditional certification, dkt. no. 94, and a motion to certify the class, dkt. no. 96. Because the plaintiff has stated a plausible claim, the court will deny without prejudice the motion to dismiss. As to the motions to certify the collective and Rule 23 classes, the standards for a motion for conditional certification and for a Rule

3

23 certification are not the same, and while the plaintiff has made the modest showing necessary for conditional certification, she has not satisfied the Rule 23 requirements by a preponderance of the evidence.

I.    **Defendants' Third Partial Motion to Dismiss (Dkt. No. 90)**

    A.    Third Amended Complaint

The plaintiff worked as a Med Aide at Cudahy Place, where she was responsible for caring for patients in the facility. Dkt. No. 87 at ¶5. Defendant 41 Management LLC operated Cudahy Place along with other assisted living facilities throughout Wisconsin. ¶7.

The plaintiff alleges that 41 Management hired the employees, including the Associate Administrator for Cudahy Place (who, in turn, was responsible for hiring hourly employees at each Wisconsin facility that 41 Management administers). Id. at ¶8. Prospective employees can apply to any of the facilities operated by 41 Management by submitting applications through the Encore Senior Living website (maintained by 41 Management). Id. at 9. 41 Management required each of its Wisconsin facilities to distribute a Matthews Senior Living handbook to all employees; the individual facilities had no right to make changes to the handbook prior to distribution. Id. at ¶10. 41 Management further required its facilities to distribute other policies to hourly employees without modification, including records retention policies, position descriptions, mandatory policies and procedures and a COVID screening policy. Id. at ¶11. Position descriptions prepared by 41 Management laid out the qualifications and work duties for hourly employees. Id. at ¶12.

4

41 Management performed human resources functions for all hourly employees, including the approval of discharges and wage rate increases. Id. at ¶13. It also dictated which paperwork must be used for discharge. Id. 41 Management set the minimum and maximum starting wages, id. at ¶14, set up and ran the payroll software, id. at ¶15, maintained the records for hours worked and amounts paid, ¶16, and referred to each of its facilities as one of "our communities" on the Encore Senior Living website id. at ¶17. The plaintiff alleges that Encore Management & Development and Encore Senior Living are "doing business as names for 41 Management LLC." Id. at ¶18. Every member of the "leadership team" on the Encore Senior Living website is an owner and/or employee of 41 Management. Id. at ¶19. According to the plaintiff, all defendants are employers within the meaning of Wis. Stat. §109.03(1), all engage in interstate commerce and each had annual gross volume of business at or above $500,000. Id. at ¶20.

The plaintiff alleges that 41 Management set up its payroll software to deduct meal breaks of thirty minutes or sixty minutes from the hours worked, or it rounded meal punch out and punch in times to the nearest quarter hour and deducted the time in between from the hours worked. Id. at ¶20. If the plaintiff punched back in after her meal break less than thirty or sixty minutes after she punched out, the defendants nonetheless deducted the full duration of the break. Id. at ¶21. 41 Management set up the payroll software to deduct meal breaks that were fifteen minutes or less in duration so long as the nearest quarter hour to the punch in "was different from, and later than the nearest

5

quarter hour to the punch out time." Id. at ¶22. There was no policy requiring the plaintiff, or any other employees at 41 Management's Wisconsin facilities, to take a full thirty minutes for a meal break. Id. at ¶23.

Sometimes the plaintiff did not receive an uninterrupted thirty-minute break because she was called back to work. Id. at ¶24. Even though she was allowed to submit a form documenting the unpaid meal break, the time nonetheless was deducted from her worktime. Id. The plaintiff was supposed to obtain relief coverage for her section of the facility while she took her lunch break, but she often had to remain at Cudahy Place during her meal break because there was no relief coverage. Id. at ¶25.

The plaintiff complains that several times a week a manager would tell her to perform work either before she punched in or after she punched out. Id. at ¶26. In addition, she says 41 Management didn't pay her a promised commission for recruiting new clients, id. at ¶28, and didn't pay her training pay even though she trained new employees, id. at ¶30.

In the spring of 2020, 41 Management developed a new policy requiring all employees to complete a screening checklist and a temperature check before they could enter the facility and punch in on the time clock. Id. at ¶31. They implemented the policy because of the unique features of COVID-19, the fact that COVID-19 is lethal for nursing home residents and that caregivers could pass COVID-19 to residents even if they did not exhibit symptoms. Id. The plaintiff alleges that the screening checklist and temperature check were "integral and indispensable" to her principal activity of providing care to the

6

residents and that she would not be able to perform her responsibilities if there was a risk that she could transmit COVID-19 to her patients. Id. at ¶32. 41 Management believes that it was "required by the Wisconsin Department of Health Services" to require the COVID screenings; DHS §132.42(4) prohibits employees from working in assisted living facilities when they carry a communicable disease that may result in transmission unless accommodations have been made to prevent transmission. Id. at ¶33.

The plaintiff alleges that 41 Management was responsible for having the employees punch in *after* they completed the screening checklist and the body temperature check rather than having them write down the time they began the screening process. Id. at ¶34. 41 Management set up the payroll software to round the punch times to the nearest quarter hour, "which may be 15 minutes later than the nearest quarter hour to the earlier time when the Plaintiff began the COVID screening process." Id. at ¶35. According to the plaintiff, she would have received additional weekly overtime pay if her actual start times had been used, if she had been paid for the meal breaks that she worked through or if her meal breaks of less than thirty minutes had counted as hours worked, or if she had been paid for her off-the-clock work. Id. at ¶36.

With respect to the collective class, the plaintiff brings her claims on behalf of all similarly situated employees working at Wisconsin facilities operated by 41 Management. Id. at ¶37. She asserts that other hourly paid employees punched in after they had completed symptom questionnaires and temperature checks, and/or punched in fifteen minutes or less after they

7

punched out and the nearest quarter hour to the punch in was later than the nearest quarter hour to the punch out time. Id.

The plaintiff also seeks to certify the following Rule 23 class:

> All hourly employees employed by Defendant 41 Management LLC at any [of] their Wisconsin facilities who either (a) was required to complete a Screening Checklist or temperature check before they could punch in on the time clock; or (b) punched in after a meal break less than 30 minutes after they punched out for the meal break.

Id. at ¶40. The plaintiff alleges that joinder would be impracticable because the defendants implemented the same COVID screening questionnaire policy at each of its thirty-one Wisconsin facilities. Id. at ¶41. She alleges that there are at least four common questions of law and fact, including but not limited to whether the temperature checks and COVID screening questionnaires were integral and indispensable to the performance of employees' principal activities, whether meal breaks of less than thirty minutes constitute work time, whether 41 Management was the employer of all hourly employees and the appropriate methodology when the hours were rounded. Id. at ¶42. The plaintiff says that she can adequately represent the class and that a class action is superior to any other available methods for resolving this controversy. Id. at ¶¶44-45.

Count One of the third amended complaint alleges a claim for unpaid minimum wage and overtime pay under the FLSA. Id. at ¶¶46-52. Count Two alleges a claim for unpaid wages under Wisconsin law. Id. at ¶¶53-60.

B.  Standard Governing Motion to Dismiss

A motion to dismiss tests the sufficiency of a complaint, not the merits of the case. Gibson v. City of Chi., 910 F.2d 1510, 1520 (7th Cir. 1990). "To

8

survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." Haywood v. Massage Envy Franchising, LLC, 887 F.3d 329, 333 (7th Cir. 2018) (quotations and citation omitted). See also Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."). A court deciding a Rule 12(b)(6) motion accepts the plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in plaintiff's favor. Fortres Grand Corp. v. Warner Bros. Entm't, Inc., 763 F.3d 696, 700 (7th Cir. 2014). A plaintiff need not plead "detailed factual allegations", but "still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." Bell v. City of Chi., 835 F.3d 736, 738 (7th Cir. 2016) (citation and internal quotation marks omitted).

C.     Parties' Arguments

The defendants together filed the motion to dismiss. Dkt. No. 91. Although 41 Management asserts that it is contracted to manage Cudahy Place and had no employment relationship with the plaintiff, it joined in the motion because the plaintiff has alleged that 41 Management was a joint employer. Id. at 1. The defendants—together—move to dismiss the portion of the third amended complaint related to pre-shift temperature checks and health questionnaires. Id. at 2. First, the defendants argue that the temperature check

9

and symptom questionnaire are neither integral nor indispensable because they are not intrinsic to the plaintiff's principal activities as required under the FLSA and Wisconsin wage and hour law. Id. at 4. The plaintiff's principal duty was to care for Cudahy Place residents and she historically had performed this duty without completing a temperature check and symptom questionnaire. Id. at 7. The defendants cite cases which they say hold that the screening time is non-compensable. IBP, Inc. v. Alvarez, 546 U.S. 21, 42 (2005) (holding that time spent donning protective gear was non-compensable because it was "two steps removed from the productive activity on the assembly line"); Anderson v. Perdue Farms, Inc., 604 F. Supp. 2d 1339, 1359 (M.D. Ala. 2009) (time spent going through a security line is not compensable); Gorman v. The Consolidated Edison Corp., 488 F.3d 586, 593 (2nd Cir. 2007) (waiting in line at a vehicle entrance was not compensable). The defendants argue that the time spent checking temperatures and completing the health questionnaire was *de minimis.* Id. at 8 (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 692 (1946). The defendants assert that "based on the scantly pleaded facts, neither act could take more than a few moments." Id. at 9.

The plaintiff responds that her principal activity was to provide care that safeguards the residents. Dkt. No. 93 at 1. Temperature checks detect potentially symptomatic cases of COVID-19 and screening questionnaires help identify close contacts and potentially asymptomatic cases. Id. These measures "reduced the odds" that the employees were carrying COVID-19 or transmitting the virus to the residents. Id. at 5. The plaintiff says that it is irrelevant that

10

the screening and temperature checks did not become necessary until there was detectable community spread of COVID-19 and that the timing does not make them less integral. Id. at 2, 5. The plaintiff further maintains that there is no *per se* rule that screenings are not compensable. Id. at 6 (citing Aguilar v. Mgmt. and Training Corp., 948 F.3d 1270. 1279 (10th Cir. 2020)). She relies on a Department of Labor Wage and Hour Division published guidance in a question-and-answer publication:

> For many employees, undergoing a temperature check before they begin work must be paid because it is necessary for their jobs. For example, if a nurse who performs direct patient care services at a hospital is required to check her temperature upon arrival at the hospital before her shift, the time that she spends checking her temperature upon entry to the worksite is likely compensable because such a task is necessary for her to safely and effectively perform her job during the pandemic.

Id. at 9 (citing https://www.dol.gov/agencies/whd/flsa/pandemic).

With respect to the *de minimis* defense, the plaintiff makes three arguments. First, she argues that the defendant's decision to round all punch ins to the nearest quarter hour ensured that the plaintiff would either lose no time or be underpaid by fifteen minutes. Id. at 11. Second, she argues that the court can't dismiss a case where the *de minimis* defense is an affirmative defense and the plaintiff has not admitted the facts to support the defense. Id. at 12. Third, she argues that the *de minimis* defense requires a balancing of the amount of unpaid time, the practical administrative difficulties of tracking additional time, the regularity with which the additional work is performed and the amount of compensable time involved—all of which require factual development beyond the pleadings. Id. at 14-15

11

In reply, the defendants argue that the temporary changes they implemented due to COVID-19 "do not transform the duties of [the plaintiff's] position nor are they intrinsic, integral, or indispensable elements of the principal activities of Plaintiff's job." Dkt. No. 99 at 1. The defendants assert that the plaintiff—a medication aide—"misrepresented her duties, overvalued the role of the screenings in preventing the spread of COVID-19, elevated recommendations to 'law', and has misrepresented Defendants' arguments." Id. at 2. According to the defendants, the plaintiff is not tasked with "protecting the safety" of the residents but rather administering daily medication to residents. Id. at 2, 4. They argue that the cases she cited involved preliminary activities that were inherently part of the job; the defendants say the COVID screening and temperature checks were a temporary response to outside circumstances. Id. at 3. The defendants further argue that the plaintiff's citation to the Department of Labor website does not require deference and that the plaintiff omits language on the website that begins with "it depends." Id. at 7-8. Finally, the defendants argue that the timeclock rounding argument is nothing more than an "elaborate hypothetical" that does not satisfy the Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) pleading standard. Id. at 8. They assert that nothing in the complaint or the plaintiff's brief suggests that the screening took more than a few minutes; the defendants argue that the plaintiff has pled no facts to suggest that this screening was any different than "what citizens of this country have become accustomed to over the past two years." Id. at 10.

12

D.     Analysis

Under the FLSA, an employer must compensate employees who work more than forty hours a week. 29 U.S.C. §207(a). Not all work-related activities are compensable under the FLSA. See 29 U.S.C. §254. The FLSA applies to an employee's principal activity. Chagoya v. City of Chi., 992 F.3d 607, 618 (7th Cir. 2021). The workday begins when the employee commences a principal activity. Id. at 617. Principal activity is activity that the employee is employed to perform, and includes all activities that are "integral and indispensable" to those activities. Id. at 618; 29 C.F.R. §790.8(b); see also Alvarez, 546 U.S. at 37. More specifically, an activity is integral and indispensable to the principal activities if "it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform those activities." Integrity Staffing Sols., Inc. v. Busk, 574 U.S. 27, 33 (2014). Not all work-related activities are compensable. For example, the FLSA does not apply to an employee's preliminary or postliminary activity. Chagoya, 992 F.3d at 617. A "preliminary activity" is "an activity engaged in by an employee before the commencement of his 'principal' activity or activities." 29 C.F.R. §790.7(b).

The parties dispute whether the COVID screening (the temperature check and completion of the questionnaire) is a principal activity or a preliminary activity. Supreme Court case law offers some guidance, beginning with a ruling that battery-plant employees could be compensated for changing clothes at the beginning of the shift and showering at the end of shift where they came in contact with dangerously caustic and toxic materials. Steiner v. Mitchell, 350

13

U.S. 247, 248 (1956). Similarly, the Court held that employees of a meatpacking plant were entitled to compensation for time spent on knife-sharpening activities before or after shift because they needed the sharp knives to perform their butchering operations. Mitchell v. King Packing Co., 350 U.S. 260, 263 (1956). In contrast, time spent waiting to don protective gear was not compensable in a meat processing plant because it was "two steps removed from the productive activity on the assembly line. Alvarez, 546 U.S. at 42 . And, in Integrity Staffing, the Supreme Court held that antitheft, post-shift security screenings were not an intrinsic element of retrieving inventory and packaging it for shipment. 574 U.S. at 35. The Court emphasized that an activity is not a principal activity merely because the employer requires it. Id. More recently, the Seventh Circuit held that the time it takes SWAT operators to transport, unload and safely store work equipment in their homes was not "integral and indispensable," but was preliminary and postliminary. Chagoya, 992 F.3d at 622.

Neither the United States Supreme Court nor the Seventh Circuit has weighed in on COVID-19 screenings or temperature checks. A district court in the Southern District of California granted a motion to dismiss where an employee of O'Reilly Auto Enterprises alleged that the COVID-19 screening requirements, including a temperature check, were compensable work under the FLSA. Pipich v. O'Reilly Auto Enters., LLC, No. 21cv1120-L-LL, 2022 WL 788671, *2 (S.D. Cal. March 15, 2022). The court disagreed because the pre-shift COVID screening was not the "principal activity or activities which [the]

14

employee was hired to perform. Id. at *4 (quoting 29 U.S.C. 254(a)(1)). O'Reilly hired the employee to load and transport automobile parts from the distribution center throughout southern California. Id. The court cited the FLSA Questions and Answers on the Department of Labor website explaining how the activities may be indispensable for a nurse whose principal job duties include patient care services. Id. (citing https://www.dol.gov/agencies/whd/flsa/pandemic). The court explained that O'Reilly Auto Enterprises could have eliminated the screening without hindering the employee's ability to do his or her job. Id.

Similarly, a district court in the Western District of Missouri held that the time spent in mandatory COVID-19 screenings was not integral and indispensable to the principal duties of a Walmart employee who was hired to stock, unload, assist customers, work the cash register and greet customers. Perez v. Walmart, Inc., No. 4:21-cv-00120-HFS, 2021 WL 5741484, *4 (W.D. Mo. Oct. 25, 2021).

On the other hand, a district court in the Eastern District of California held that Amazon employees working in a warehouse sufficiently alleged that the policy requiring them to undergo COVID-19 screening was work and integral and indispensable to principal activities. Boone v. Amazon.com Services, LLC, No. 21-cv-00241-DAD-BAM, 562 F. Supp. 3d 1103, 1118 (E.D. Cal. 2022). In Boone, the plaintiffs had alleged that the screenings prevented the COVID-19 virus "from spreading throughout the defendant's fulfillment centers and infecting employees and products." Id. The court distinguished

15

cases finding security screenings to be preliminary work because the COVID-19 screenings were "meant to prevent the spread of a highly-contagious and deadly virus among employees." Id. The court also declined to rule that the screenings were *de minimis* where the plaintiffs alleged that they took approximately ten to fifteen minutes on average but said that the screenings could last longer depending how many people were in line. Id.

The plaintiff in this case did not deliver auto parts, stock shelves or unload packages. She alleges that she was a Med Aide in a memory care center and responsible for the patients who resided in the facility. Dkt. No. 87 at 2. She alleges that the screening checklist and body temperature check were "integral and indispensable to the plaintiff's principal activity of providing care for the defendants' residents that safeguarded and protected their health and welfare, so that she could not perform her patient care responsibilities if there was a material risk she could transmit COVID-19 to her patients." Id. at ¶32. She asserts that the defendants implemented the screening policy because COVID-19 was "especially lethal for nursing home residents and that caregivers could transmit COVID-19 to nursing home residents even though they did not exhibit symptoms." Id. at ¶31. While the defendants characterize the plaintiff's role as doing nothing more than dispensing medications, when considering a motion to dismiss for failure to state a claim, the court "must accept as true all the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 93 (2007) (citing Bell Atlantic v. Twombly, 550 U.S. 544, 555-556 (2007)). It is more than plausible that the plaintiff had direct patient contact

while administering medications in the memory care facility and that the COVID-19 screening may have been integral and indispensable to her ability to do so without posing a risk to the patients.

While the court agrees that the FAQ section of the Department of Labor website is neither binding nor requires deference, the example provided in the answer to Question No. 4 ("My employer requires all employees to take their temperature to try to screen for people who might have COVID-19 before entering the job site. Do I need to be paid for the time spent taking my temperature?") is illustrative. The Department of Labor acknowledged that whether COVID temperature checks are compensable will depend on the job position and whether the check is "necessary for the work you do." It explains:

> For many employees, undergoing a temperature check before they begin work must be paid because it is necessary for their jobs. For example, if a nurse who performs direct patient care services at a hospital is required to check her temperature upon arrival at the hospital before her shift, the time that she spends checking her temperature upon entry to the worksite is likely compensable because such a task is necessary for her to safely and effectively perform her job during the pandemic. In other words, the check is integral and indispensable to the nurse's job.

COVID-19 and the Fair Labor Standards Act Questions and Answers, https://www.dol.gov/agencies/whd/flsa/pandemic, (last visited October 4, 2022). The evidence may show that a Med Aide in a memory care facility is similarly responsible for direct patient care services.

The defendants contend that the screening and temperature check may be "indispensable" but still not compensable if the time spent on the screening activities is *de minimis*. "The *de minimis* doctrine allows employers to disregard

17

otherwise compensable work when only a few seconds or minutes of work beyond the scheduled working hours are in dispute." Kellar v. Summit Seating, Inc., 664 F.3d 169, 176 (7th Cir. 2011) (citing Singh v. City of New York, 524 F.3d 361, 370 (2d Cir. 2008)). When evaluating whether work performed by an employee is *de minimis*, courts typically consider the amount of time spent on the extra work, the practical administrative difficulties of recording additional time, the regularity with which the additional work is performed and the aggregate amount of compensable time. Id. (citing Lindow v. United States, 738 F.2d 1057, 1062-63 (9th Cir. 1984); 29 C.F.R. §785.47).

The plaintiff alleges that 41 Management set up its payroll software to round the punch-in times to the nearest quarter hour, which meant it could be up to fifteen minutes later than the nearest quarter hour to when the plaintiff began the screening process. Dkt. No. 87 at ¶35. In her brief, the plaintiff reasoned that her starting time was impacted by the need to complete the screening because the defendant rounds the punch time; because her punch time started after she completed the screening, the impact was always zero minutes or fifteen minutes in the defendants' favor and that an underpayment by fifteen minutes is not *de minimis*. Dkt. No. 93 at 12 (citing Kellar, 664 F. 3d at 177) (indicating that the defendants had not identified any cases holding that ten to fifteen minutes of uncompensated work was *de minimis*).

At the motion to dismiss stage, the court "accept[s] all well-pleaded allegations as true, and . . . draw[s] all reasonable inferences in favor of the plaintiff." Circle Block Partners, LLC v. Fireman's Fund Ins. Co., 44 F.4th

18

1014, 1018 (7th Cir. 2022) (citing Bilek v. Fed. Ins. Co., 8 F.4th 581, 584 (7th Cir. 2021)). The plaintiff has alleged that the time spent performing the temperature check and completing the COVID questionnaire exceeds the ten-minute *de minimis* benchmark because of the practice of rounding to the nearest quarter hour. The Seventh Circuit has declined to find preliminary work *de minimis* when it took between fifteen and forty-five minutes (again, while commenting that the defendant failed to cite any cases finding work exceeding approximately ten minutes *de minimis*). Kellar, 664 F.3d at 177. At this stage, the court cannot—and should not—determine whether the defendants have evidence to prevail on this argument. The allegations are sufficient and the parties may test those allegations through discovery. See, e.g., Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007) ("[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."); Huon v. Denton, 841 F.3d 733, 742 (7th Cir. 2016). The court will deny the motion to dismiss without prejudice.

## II. Plaintiffs' Motion for Conditional Certification (Dkt. No. 94)

### A. Parties' Arguments

The plaintiff filed a motion for "conditional certification" of two "collectives":

> All hourly employees who worked at any Wisconsin facility administered by 41 Management during the time period on and after March of 2020; and all hourly employees who worked at any Wisconsin facility administered by 41 Management during the time period on or after January 13, 2018, and who had work time

deducted when they punched in after a meal break less than 20 minutes after they punched out for the meal break.

Dkt. No. 94 at 1. The motion, which is a paragraph long, does not reference any statute or authority.

In her brief in support of the motion, the plaintiff says she seeks conditions certification of "two separate subclasses." Dkt. No. 95 at 1. She clarifies that the first subclass includes people employed after 41 Management began to require its employees to complete temperature checks and symptoms questionnaires before each shift. Id. The brief does not identify the statute under which the plaintiff seeks certification until the second page—the plaintiff seeks certification of Fair Labor Standards Act collectives under 28 U.S.C. §216. Id. at 2.

Reminding the court that only a modest showing is required for conditional certification of an FLSA collective, the plaintiff argues that she has demonstrated a reasonable basis for believing that she is similarly situated to potential class members. Id. at 3. The plaintiff says 41 Management exercises control over the employees in each Wisconsin facility in a uniform manner by using the same Matthews Senior Living Handbook, hiring facility managers, and implementing policies on what records must be maintained. Id. at 7-8. She asserts that at each facility it administers, 41 Management implemented the same COVID screening policies, used the same payroll software and controller and set up the payroll based on the punch times rather than the screening times. Id. at 8. She argues that these alleged policies or practices will allow the court to determine whether the temperature checks and symptoms

20

questionnaires were integral and indispensable and whether the federal rounding regulation requires the employer to round the time to the nearest quarter hour of when the employee started working. Id. at 12. The plaintiff argues that the court will be able to decide how long a meal break must be in order to qualify as a non-compensable meal under the FLSA. Id. at 15. The plaintiff cautions that courts should wait until the decertification stage to decide whether the questions of damages predominate over common questions of liability. Id. at 19.

The defendants respond that the plaintiff has not made the requisite showing because (1) she has failed to identify a uniform COVID-19 screening or meal break policy that applied to all potential class members and (2) individual considerations make the collective treatment impossible. Dkt. No. 103 at 1. The defendants argue that the time spent in preliminary screening is not compensable, but they maintain that if it *were* compensable, the rounding policy is lawful and functions as directed by 29 C.F.R. §785.48(b). Id. at 6. The defendants point out that the rounding works both ways, often rewarding the plaintiff with additional time by deeming the plaintiff to have punched in earlier than she actually did. Id. They argue that the plaintiff submitted evidence of only one instance (on May 8, 2020) in which the screening requirements resulted in time not compensated, reasoning that if it happened to her once, it must have happened to others; the defendant argues that a "one-off" example does not show a violation of the law. Id. at 7. They also argue that the plaintiff has identified only one other employee whose time performing the screening

21

tasks was not compensated, a single instance five months after the plaintiff's incident. Id. The defendants cite to the plaintiff's own time records showing occasions where she punched in and out and benefitted from the rounding because it rewarded her with extra compensable time. Id.

With respect to the meal break policy, the defendants explain that the actual policy at issue states that:

> Full-time employees are allowed thirty (30) minutes for a meal period. The meal period is non-work time and is unpaid. You must sign out and then back in on your time sheet to record your meal period. The thirty (30) minutes for your meal time will be deducted from your worked hours. If you leave the community you must clock out and clock back in at the end of your meal break. Employees must receive advance approval from their supervisor to work during part or all of a scheduled meal period. All meal periods will be scheduled by your supervisor. Meal periods for employees working less than full-time should be arranged with your supervisor.

Id. at 8. The defendants argue that the plaintiff has identified one occasion— out of all her time records—where she punched in early from a meal break and was not compensated. Id. at 9. They point out that the plaintiff does not say that she notified a supervisor or requested permission for a shortened break or otherwise allege that Cudahy Place maintains a policy of providing meal breaks of less than twenty minutes. Id. They assert that the plaintiff's only other example, a single instance involving another employee, occurred months earlier and that the plaintiff's entire motion is based on these two incidents. Id. at 9.

For both subclasses, the defendants argue that individual considerations make collective treatment impossible. Id. at 10. The defendants insist that there is no uniform break policy or universal COVID-19 screening policy that is a violation of FLSA (because rounding often favors employees and complies

22

with 29 C.F.R. §785.48(b)). Id. at 12. They also emphasize the fact that each individual facility will need to be examined to determine how much time the screening and temperature process took and the records for every hourly, shift employee will have to be examined to determine whether screening time was already compensated through rounding. Id. Finally, they argue that the proposed notice is deficient because the opt-in notice does not distinguish between the two collectives, lists an incorrect period ("on or after January 13, 2018" does not include a cut-off date and could be greater than the maximum three-year period), id. at 13, fails to adequately inform opt-in plaintiffs that they may be required to participate in the lawsuit by providing testimony, fails to notify opt-in plaintiffs that they may obtain their own counsel, id. at 14, and incorrectly refers to plaintiffs (plural) rather than plaintiff Harwell-Payne, id. at 15.

In her reply brief, the plaintiff reminds the court that certification of a collective is a low bar and maintains that she identified at least one other class member who was subject to and harmed by the same policies that she says harmed her. Dkt. No. 105 at 1. She denies conceding that it would take her only one minute to complete the COVID-19 screening process and walk the 100-200 feet to the time clock and punch in. Id. The plaintiff is adamant that she could have lost fifteen minutes per day because of the rounding policy. Id. The plaintiff suggests that the defendants had the burden to show that there was a facility in which employees could punch in before their COVID screenings. Id. at 3. She also reminds the court that individual issues should

23

be resolved at the decertification stage. Id. at 4. She asserts that for now, it matters only that there was a common policy of rounding in place. Id.

As to identifying similarly situated employees, the plaintiff cites a case decided by this court, Krupp v. Impact Acquisitions LLC, No. 14-cv-950-pp, 2016 WL 7190562 (E.D. Wis. 2016), where the court granted conditional certification even though the plaintiff's evidence showed that only two members of the proposed collective worked through lunch. Id. at 7. She argues that in this case, the defendants do not dispute that the plaintiff has identified herself and one other individual who should have received additional pay. Id. at 7-9. The plaintiff says that it is the defendants who have no evidence, asserting that they have failed to produce anything that would suggest that they adjusted employees' pay for the shortened break, provided employees with another paid break to offset the shortened break or that employees would extend their breaks after the punched back in. Id. at 12. Finally, the plaintiff says that the defendants' objections to the form of the notice are baseless because the opt-in plaintiffs are opting into a lawsuit rather than claims. Id. at 14. She insists that there is no rule that limits recovery to three years (arguing that the three-year limitation period applies to the time in which the plaintiff must commence the case rather than recover damages); she states that anyone can be subpoenaed (which would constitute actively participating in the lawsuit) whether or not they opt in; and she says that the court already has rejected the argument that a collective action should notify prospective class members of their right to retain their own counsel. Id. at 15 (citing Morgan v. N. Concrete

24

Construction, Inc., No. 17-C-1007, 2017 WL 6622547, *4 (E.D. Wis. Dec. 28, 2017)).

B. <u>Analysis</u>

If an employer fails to pay sufficient wages to its employees, the FLSA allows employees to bring a collective action on behalf of themselves and "other employees similarly situated." 29 U.S.C. §216(b); <u>see</u> <u>Alvarez v. City of Chi.</u>, 605 F.3d 445, 448 (7th Cir. 2010). A FLSA collective action class differs from a Rule 23 class; members of a FLSA class "must opt into the suit to be bound by the judgment or settlement in it, while in a class action governed by Rule 23(b)(3) (a class action seeking damages) they must opt out not to be bound." <u>Espenscheid v. DirectSat USA, LLC</u>, 705 F.3d 770, 771 (7th Cir. 2013). Courts in this circuit "generally employ a two-phase inquiry in determining who is similarly situated and, thus, entitled to notice" for FLSA collective certification. <u>Brabazon v. Aurora Health Care, Inc</u>., No. 10-CV-714, 2011 WL 1131097, at *2 (E.D. Wis. Mar. 28, 2011).

At the first step, the court determines whether the collective action should be certified for purposes of sending the notice and conducting collective discovery. <u>Adair v. Wis. Bell, Inc.</u>, No. 08-C-280, 2008 WL 4224360, at *1 (E.D. Wis. Sept. 11, 2008)). The FLSA allows notice to be sent if the plaintiff makes a "a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." <u>Id.</u> (quoting <u>Young v. Cooper Cameron Corp.</u>, 229 F.R.D. 50, 54 (S.D. N.Y. 2005)). The court does not resolve factual disputes or decide substantive issues

on the merits. Larsen v. Clearchoice Mobility, Inc., No. 11 C 1701, 2011 WL 3047484, at *1 (N.D. Ill. July 25, 2011). Later—usually after discovery— the court moves to the second step, determining whether the plaintiffs who opted in are similarly situated. Bitner v. Wyndham Vacation Resorts, Inc., 301 F.R.D. 354, 357 (W.D. Wis. 2014).

The plaintiff argues that the collective members of the two subclasses were subject to the same policies or practices. The first subclass proposed by the plaintiff requires some clarification: the motion asks to certify a collective for "all hourly employees who worked at any Wisconsin facility administered by 41 Management during the time period on and after March of 2020." Dkt. No. 94 at 1. The plaintiff's brief explains that she meant to define this collective as the employees who "worked at any Wisconsin facility managed by 41 Management after 41 Management began to require its employees to complete temperature checks and symptoms questionnaires at the beginning of each shift." Dkt. No. 95 at 1. She intended the second collective to include all those who used the punch clock for meal breaks of less than twenty minutes. Id.[1]

The plaintiff appears to have settled on 41 Management and Cudahy Place as defendants under a joint liability theory (after having first sued Matthews Senior Housing, LLC, then adding Encore Management and Development and Encore Senior Living). Dkt. No. 95 at 4 (citing Dkt. No. 57-9

---

[1] It is not clear why the plaintiff did not describe in the motion for certification the collectives that she describes in her brief in support of the motion.

at 4). Cudahy Place is not mentioned in the definitions of the proposed subclasses. The plaintiff claims that the defendants she previously named are "doing business as" names for 41 Management. Id. The plaintiff says that Encore Senior Living's website lists 31 facilities in Wisconsin including Cudahy Place. Id.

The evidence filed by the plaintiff in support of her theory includes the deposition testimony of Thomas Ostrom, who owns Cudahy Place and runs 41 Management. Dkt. No. 57-9 at 3, Tr. Page 7, lines 9-11; Tr. Page 8, lines 16-19. Ostrom testified that Encore Management and Development and Encore Senior Living are tradenames for a "group of buildings that we—that are—I guess it is 41 Management;" when asked if Encore Management Development and Encore Senior Living are the same entity as 41 Management, LLC, he said "[t]hey're the tradenames for that entity, that's what we—yes." Id. at 4, Tr. Page 12, lines 8-12. Ostrom acknowledged that the Encore Senior Living website includes thirty-two or thirty-three facilities—not nursing homes—and approximately half have an owner other than Ostrom. Id., Tr. Page 11, lines 21-24. Ostrom also confirmed that the "company" implemented a COVID-19 screening policy as required by the Wisconsin DHS but the same policy was not implemented in Minnesota. Id. at 5, Tr. Page 22, lines 24-25, Tr. Page 23, lines 1-12. He testified that the Wisconsin facilities operate under the same ADP payroll software. Id., Tr. Page 23, lines 13-15.

1.     *Common Policies*

With respect to the policies at issue, the plaintiff filed portions of the deposition transcript of Jennifer Martell, the 41 Management employee who gave permission for a Cudahy Place supervisor to terminate the plaintiff. Dkt. Nos. 57-8 at 3, Tr. Page 6, lines 4-5; 58. The Matthews Senior Living Handbook, which Martell confirmed was distributed to the plaintiff, states as follows:

> Work time does not include the time you are not expected to be working such as lunch breaks . . . . Working "off the clock" is not permitted under any circumstances and may result in disciplinary action, up to and including termination of employment. You are required to notify the Human Resources Manager immediately if you are being asked or required to work off the clock.

Dkt. No. 57-2 at 29; 57-8 at 7, Tr. Page 26, line 25, Tr. Page 27, lines 1-4.

> MEAL PERIOD
> Full-time employees are allowed thirty (30) minutes for a meal period. The meal period is non-work time and is unpaid. You must sign out and then back in on your time sheet to record your meal period. The thirty (30) minutes for your meal time will be deducted from your worked hours. If you leave the community you must clock out and clock back in at the end of your meal break. Employees must receive advance approval from their supervisor to work during part or all of a scheduled meal period. All meal periods will be scheduled by your supervisor. Meal periods for employees working less than full-time should be arranged with your supervisor.

Dkt. No. 57-2 at 30.

Martell testified that the Matthews Senior Living handbook was distributed to every Wisconsin nursing home on the website and it was revised in October of 2019 after a Minnesota acquisition. Dkt. No. 57-8 at 8, Tr. Page 31, lines 4-7. There were no major changes and the "one from October 1, 2019 was only given to Minnesota [nursing homes] and the only thing that changed

28

was the Encore name." Id., Tr. Page 32, lines 1-10. Martell also testified that the payroll software was set up to deduct fifteen minutes from work even if someone punched out and in for a break that was less than fifteen minutes. Id. at 15, Tr. Page 77, lines 19-24. The policy changed in February 2021 and employees were instructed to fill out an exception form if they punched back in less than fifteen minutes after they had punched out for a break. Id. at 16, Tr. Page 78, Lines 23-25, Tr. Page 79, lines 1-6.[2]

As for the COVID-19 screening policy, all employees at Cudahy place— roughly thirty—would be subject to screening at the front desk (the same place where visitor screenings took place). Dkt. No. 57-8 at 18, Tr. Page 83, lines 1-17. Employees completed the screening with a temperature check and a questionnaire that included two questions: (1) asking the employee to circle any of twelve symptoms he or she had experienced in the last fourteen days; and (2) asking the employee to circle yes or no to whether he or she has travelled internationally or had direct contact with anyone with COVID-19. Dkt. No. 57-3. The employee then walked to the time clock to punch in. Dkt. No. 57-8 at 18, Tr. Page 85 at 10-18. According to Martell, by the time COVID-19 broke out, the only way to punch in and out at Cudahy Place was a time clock; other Wisconsin facilities may have had a tablet or a time clock. Id. at 13, Tr. Page 64, lines 7-17. The time clock for Cudahy Place was located in the employee break room. Id., Tr. Page 65, lines 8-10. Not all "communities" have a

_____

[2] Pages 16 and 17 of the transcript of Jennifer Martell's deposition at Dkt. No. 57-8 are identical.

break room and in other facilities it might be located near the administrator's office. <u>Id.</u> at 14, Tr. Page 66, lines 66-67. If the employee failed to use a tablet or the time clock, they would fill out a paper time sheet. <u>Id.</u>, Tr. Page 68, lines 13-17. Under those circumstances, the administrator would not adjust the time to a quarter hour for inputting into the system. <u>Id.</u>, Tr. Page 9, lines 5-8. The plaintiff filed her own declaration explaining that the screening process typically took three to ten minutes to complete, depending on how fast she was able to get a working thermometer to take her temperature. Dkt. No. 75 at ¶2.

"At the first step [of the two-step collective certification process], plaintiffs need only make a 'modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law.'" <u>In re New Albertsons, Inc.</u>, No. 21-2577, 2021 WL 4028428, at *1 (7th Cir. Sept. 1, 2021) (citing, *e.g.*, <u>Ivery v. RMH Franchise Corp.</u>, 280 F. Supp. 3d 1121, 1132-33 (N.D. Ill. 2017)). Given that low standard, the court will grant the motion to conditionally certify the collectives. The plaintiff is alleging a payroll practice that may not be consistent with the meal break policy included in the handbook. The plaintiff is alleging that the defendants used ADP software for the payroll to deduct any time taken for a meal break even if it was less than twenty minutes. The actual policy requires an employee to clock out and clock back in and receive approval from a supervisor for to work during part or all the scheduled meal period. What happened and how often it happened are individual, fact specific issues that are best addressed at the second step of the process, where the court reevaluates the conditions

certification to determine whether there is sufficient similarity between the opt-in plaintiffs. See In re Albertsons, 2021 WL 4028428, at *1. The court notes that it recently granted a motion for conditional certification filed by plaintiff's counsel making similar allegations regarding the use of ADP software to deduct meal breaks for fifteen minutes or less. Gomez v. Marchese & Co. and Cut Fresh, No. 20-cv-1802-pp, 2022 WL 3228047, *12 (E.D. Wis. Aug. 10, 2022).

With respect to the COVID-19 policy, 41 Management implemented the same screening policy across all facilities. The plaintiff's challenge to the policy results from the defendants' practice of rounding to the nearest quarter hour. The court concedes that it is not clear how the COVID-19 screening impacted employees at other facilities who used a tablet instead of a punch clock or whose facility kept the tablet or punch clock somewhere other than the break room. Representatives of 41 Management admitted that they used the same payroll and software system across facilities and that the policies in the Matthew Senior Living Handbook applied to all. The plaintiff has pushed the limits of what may satisfy a "modest" showing by providing only one example from the plaintiff and one from another employee, but at this stage the court doesn't focus on whether there was an actual violation. See Paswaters v. Krones Inc., No. 19-CV-993-JPS2020 WL 419336, at *2, n.2 (E.D. Wis. Jan. 27, 2020) (applying traditional "lenient standard" when the parties have conducted "modest discovery"). "The court does not make merits determinations, weigh evidence, determine credibility, or specifically consider opposing evidence presented by a defendant.'" Fares v. H, B, & H, LLC, No. 21-cv-753, 2022 WL

31

72081, *3 (E.D. Wis. Jan. 7, 2022) (quoting Bergman v. Kindred Healthcare, Inc., 949 F. Supp. 2d 852, 855-56 (N.D. Ill. 2013)).

Having conditionally certified the collective action, the court must address the proposed notice and proposed opt-in form. The defendants raise four issues with the notice: (1) it does not distinguish between the two collectives; (2) it lists an incorrect period; (3) it fails to adequately inform the opt-in plaintiffs of participation requirements or their right to retain their own counsel; and (4) it lists multiple plaintiffs. The court may prescribe the form, manner, and timing of notice to ensure that putative collective members receive "accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." See Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 170 (1989).

2. *Notice*

a. Distinguishing Between the Two Collectives

The defendants say that the proposed notice fails to differentiate between the two subclasses, "likely encompassing different groups, with different damages calculations, and involving different legal issues;" an employee may want to participate in one but not the other. Dkt. No. 103 at 13. The plaintiff has proposed the following language:

> A lawsuit has been brought by Charletta Harwell-Payne, who worked as a hourly employee at the Cudahy Place, against 41 Management, LLC in the United States District Court for the Eastern District of Wisconsin (Case No. 21CV328). The lawsuit alleges that 41 Management was the employer of employees at each Wisconsin assisted living facility that it administered. The Court has certified collective actions that bring the following two claims:

32

First, if you worked at a Wisconsin facility administered by 41 Management during the time period on or after March of 2020, you were required to complete a temperature check and a screening questionnaire before you were allowed to walk to the time clock or tablet to punch in. To determine your start time 41 Management rounded to the nearest quarter hour the time when you punched the time clock or tablet, rather than when you earlier started your temperature check/symptoms questionnaire. The lawsuit alleges that by doing so, 41 Management may have under-counted your start time by 15 minutes per day, because the quarter hour nearest to your punch-in time may be 15 minutes later than the quarter hour nearest to the time when you began your screening. For example, if you started the temperature check at 8:20 a.m., and punched in at 8:23 a.m., the quarter hour nearest to 8:20 a.m. is 8:15 a.m., while the quarter hour nearest to the punch in time of 8:23 a.m. is 8:30 a.m. The lawsuit alleges that on this day you should have been paid starting at 8:15 a.m., while 41 Management did not start to pay you until 8:30 a.m.

Second, the lawsuit alleges that if you punched in after a meal break less than 20 minutes after you punched out for the meal break, 41 Management's payroll software would round both the meal break punch out time and the meal break punch in time to the nearest quarter hour. If the quarter hour nearest to the meal break punch in time is later than the quarter hour nearest to the meal break punch out time, the difference would be deducted from your hours worked. For example, if you punched out for a meal break at 12:05 p.m. and punched back in at 12:21 p.m., 41 Management would round the 12:05 p.m. to 12:00 p.m., round the 12:21 p.m. to 12:15 p.m., and deduct 15 minutes from your hours worked. Plaintiffs contend that breaks of less than 20 minutes must be paid rest breaks, so that no work time can be deducted from an employee for taking breaks that are less than 20 minutes long.

Dkt. No. 94-2 at 1.

The notice further explains that the recipient is entitled to participate if he or she either "(a) worked at the 41 Management facility after the temperature checks and symptoms questionnaires were implemented; or (b) had at least one meal break of less than 20 minutes deducted from [] work time." Id. at 2. The court concludes that the notice adequately distinguishes

33

between the two subclasses/collectives and the defendants have not cited case law requiring the opt-in plaintiffs to join a *claim* rather than the lawsuit, particularly where the alleged practices allegedly applied to all employees of all facilities.

b. Period

The proposed notice is addressed to all hourly employees who worked at a Wisconsin facility operated by 41 Management, LLC "during the time period on or after January 13, 2018." Dkt. No. 94-2 at 1. The defendants say the plaintiff should include a cut-off date because there is a maximum three-year statute of limitations. Dkt. No. 103 at 13. Without citing any law, the plaintiff responds that the statute does not "impose any limitation on the latest time that a FLSA claim can seek redress for," and argues that collective members may recover damages "up to the present day" unless the defendants change their policies. Dkt. No. 105 at 14.

The statute reads as follows:

Any action commenced on or after May 14, 1947, to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended [29 U.S.C. 201 et seq.], the Walsh-Healey Act, or the Bacon-Davis Act

(a) if the cause of action accrues on or after May 14, 1947—may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued . . . .

34

29 U.S.C. §255(a). So the statute has either a two- or a three-year limitation period, depending on whether the violation was willful. <u>Smith v. Professional Transportation, Inc.</u>, 5 F.4th 700, 703 (7th Cir. 2021).

An FLSA action "commences" under §255 on the date the complaint is filed,

> except that in the case of a collective or class action instituted under the Fair Labor Standards Act of 1938, as amended . . . it shall be considered to be commenced in the case of any individual claimant—
>
> (a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or
>
> (b) if such written consent was not so filed or if his name did not so appear—on the subsequent date on which such written consent is filed in the court in which the action was commenced.

29 U.S.C. §256.

"The Act has a two- or three-year statute of limitations, 29 U.S.C. § 255(a), which means that, if the written consent requirement applies, plaintiffs seeking to be represented in the collective action need to file the written consent within that time." <u>Smith</u>, 5 F.4th at 703.

The notice invites anyone who met the collective definitions between January 13, 2018 and the present to opt in. The plaintiff filed the complaint on August 31, 2020—just over two and a half years from the date identified in the notice. The plaintiff alleges that the three-year limitation period applies (and that she is entitled to liquidated damages) because the defendants had "no reasonable grounds for believing that its methodology for non-compensation

35

and compensation of its hourly employees complied with the FLSA." Dkt. No. 87 at ¶51. Whether the plaintiff's claims are subject to the two-year or three-year limitation period will depend on the evidence. That is a question for another day, as are the questions of whether any collective members are subject to the two- or three-year limitations period and the amount of damages anyone may collect.

The defendants are correct, however, that the outer limit of the limitation period is three years from January 13, 2018. The court will require the plaintiff to modify the notice to add an end date of January 13, 2021.

### c. Participation and Counsel of Choice

The defendants next ask the court to revise the notice to make clear that that an opt-in plaintiff will be obligated to participate in the lawsuit, "including by providing deposition or other testimony." Dkt. No. 103 at 14. The plaintiff responds that there is "no justification to mislead potential members of the collective by telling them that they may be required to actively participate in the lawsuit only if they opt in," asserting that employees could be subpoenaed to be deposed regardless of whether they opt in. Dkt. No. 105 at 15.

The plaintiff's argument does not address the defendants' concern—that as worded, the notice does not advise potential opt-ins that more may be required of them than sitting back and waiting to recover. The current language indicates only that the lawsuit will be resolved by using the employee's time and payroll records to calculate overtime play. The court agrees that the notice should contain language informing potential plaintiffs

36

that they may be required to participate in discovery. See Quinn v. Auto Injury Solutions, No. 1:20-cv-1966, 2020 WL 9397520, *5 (N.D. Ill. Nov. 24, 2020).

The defendants also argue that the notice does not advise opt-ins that they may obtain their own counsel. Dkt. No. 103 at 14. The plaintiff says that this court has rejected the argument that collective members may retain their own counsel. Dkt. No. 105 at 15 (citing Morgan v. Northern Concrete Construction, Inc., No. 16-C-1283, 2017 WL 6622547, at *4 (E.D. Wis. Dec. 28, 2017)). The plaintiff is correct; "[i]n a collective action, the proposed notice's statement explaining the effect of joining the lawsuit coordinated by collective action suffices to inform members of the proposed class." Morgan, 6622547, at *4 (citing Espenscheid v. Direct USA, LLC, No. 09-CV-625-bbc, 2010 WL 2330309, at *12 (W.D. Wis. June 7, 2010 ("[A]llowing each opt-in plaintiff to have his or her own lawyer is simply not workable. Potential plaintiffs who want a different lawyer are free to take action on their own instead of opting into the suit, as the notice already explains."). The notice clearly states that the Previant Law Firm will represent opt-ins but that they will be free to file their own suit if they do not join this lawsuit. Dkt. No. 94-2 at 3. The notice needs no revision on this basis.

### d.    Multiple Plaintiffs

Finally, the defendants argue that the notice refers to "plaintiffs," plural, rather than a single plaintiff, which gives the false impression that there are others who have brough the complaint. Dkt. No. 103 at 15. The plaintiff responds that once the court has conditionally certified the collective action,

37

she represents other plaintiffs, so the plural "plaintiffs" is appropriate. Dkt. No. 105 at 15.

The notice correctly states that the lawsuit was brought by Charletta Harwell-Payne, who worked as an hourly employee at Cudahy Place and clarifies that the lawsuit was filed against 41 Management as the employer of employees at each Wisconsin assisted living facility that it administered. Dkt. No. 94-2 at 1. However, the notice then includes a paragraph regarding "who is sending the notice" and explains that the Previant Firm represents the "Plaintiffs and other potential class members who timely consent to join this lawsuit." Id. Under "who is sending the notice," the plaintiff explains that the court has not ruled on the "Plaintiffs' claims" or "whether the Plaintiffs or any other similarly situated employees are entitled to recover any monies in this action." Id. at 2. And, under the section titled "Effect of Joining this Lawsuit," the plaintiff uses both the singular and plural possessive. Id. at 3.

The court will require the plaintiff to revise the notice, clarifying that the case was filed by a single plaintiff. All references to the plaintiff or her claims should be singular rather than plural. The court will also require the plaintiff to clean up the consent form, which currently references "Froedert" on the bottom of page two rather than the defendants. Dkt. No. 94-2 at 2.

### III. Plaintiffs' Motion to Certify Class (Dkt. No. 96)

A.    The Parties' Arguments

The plaintiff separately moves for a Rule 23 class certification of two subclasses for unpaid wages under Wis. Stat. §109.03(1). Dkt. No. 96 at 1; Dkt. No. 97 at 1. She has framed the subclasses as follows:

> 1.    All hourly employees who worked at a Wisconsin facility administered by 41 Management, LLC during the time period after 41 Management implemented temperature checks and screening questionnaires. or (b) during the time period[3]
>
> 2.    All hourly employees who worked at a Wisconsin facility administered by 41 Management, LLC who, during the time period of January 13, 2019 to the present, ever punched in after a break less than 30 minutes after they punched out for the break.

Dkt. No. 97 at 1. The plaintiff argues that the first subclass challenges the policy of rounding to the nearest quarter hour when the employee punched in rather than when he or she commenced the COVID-19 screening and temperature check. Id. The second subclass challenges the policy of setting up a payroll system that deducts time for breaks even though the employee reportedly punched back in less than thirty minutes. Id.

Addressing the Rule 23(a) requirements, the plaintiff alleges that the proposed class is easily ascertainable from 41 Management's records and that each of the two classes includes "hundreds of members." Id. According to the plaintiff, Encore Management & Development and Encore Senior Living are "doing business as" names for 41 Management and Encore Senior Living's

---

[3] Both the motion and the brief frame the first subclass in a way that does not make sense. There is a period after the word "questionnaires" and a sub (b) without a sub (a); sub (b) is an incomplete sentence.

website lists thirty-one facilities in Wisconsin. <u>Id.</u> at 3. The plaintiff says that 41 Management used uniform payroll software and the same controller to compute payroll and that software is set up to deduct worktime even when the meal breaks ae less than thirty minutes. <u>Id.</u> at 4. 41 Management also required employees to complete the COVID-19 screening questionnaire and temperature check before entering the facility and punching in. <u>Id.</u>

The plaintiff argues that the defendants have admitted that thirty hourly Cudahy Place employees were subject to the COVID-19 screening requirements and forty-three Cudahy Place employees punched in after a meal break less than thirty minutes after they punched out. <u>Id.</u> at 9. Taking this number combined with the fact that the defendants operated thirty-one facilities, the plaintiff argues that joinder is impracticable. <u>Id.</u> at 10.

With respect to commonality, the plaintiff asserts that analysis of the legality of the timekeeping practices and the payroll deductions depends on common questions of law. <u>Id.</u> at 10-13. She further argues that these claims are typical because all members were subject to the same practices. <u>Id.</u> at 14. The plaintiff reports that she has an adequate understanding of the class claims and her role as representative and there is no tangible antagonism between the plaintiff and class members. <u>Id.</u> at 15-16. Finally, the plaintiff argues that Rule 23(b) is satisfied because common questions of law predominate and damages can be ascertained from the defendants' records. <u>Id.</u> at 17-20.

40

The defendants oppose class certification on the grounds that the proposed class does not meet any of the four Rule 23(a) requirements. Dkt. No. 102 at 1. According to the defendants, the plaintiff assumes that all employees were subject to a common policy of meal breaks less than thirty minutes but has produced no evidence of any such policy. Id. at 4-5. The defendants maintain that the only evidence cited by the plaintiff was Cudahy Place's response to an interrogatory that asked the defendants to identify the number of Cudahy Place employees who "punched in on the same day as, and less than 30 minutes after they last punched out." Id. at 5. The defendants point out that this question asked nothing about meal break policies or practices. Id. at 6.

Similarly, the defendants argue that the plaintiff has made no attempt to show that there was a single COVID-screening policy that applies to all class members across the various entities. Id. at 5-6. They assert that it appears that there were several policies. Id. Cudahy Place, for example, had a digital time keeping system and paper sheets that the employees could complete when the time clock swipe was inaccurate. Id. Employees using the paper system may have accounted for their COVID-19 screening time. Id. As for adequacy, the defendants assert that the plaintiff does not work for 41 Management but rather Cudahy Place and that she does not identify the location of the time clocks in each of the facilities and cannot assume the distances between the COVID screening areas and the time clocks are similar among all facilities. Id. at 7-8.

41

Finally, the defendants argue that the plaintiff has not met the Rule 23(b)(3) requirements because there are no class-wide questions of law or fact that predominate over questions affecting individual employees; they assert that liability to any given class member will vary from employee to employee and entity to entity. Id. at 9. The defendants identify individual questions such as what information regarding meal periods was communicated at each facility, whether any employee used paper time sheets and accounted for the screening time, how long it took for each employee to complete the screening process and where the time clocks are located. Id. at 9-10.

The plaintiff replies that defendants have misconstrued the complaint. Dkt. No. 106. The plaintiff says she will argue that any meal break of less than thirty minutes is compensable and she will not try to recover for any time spent on COVID-19 screening on the days she handwrote her start times. Id. at 1. She says that under DWD §272.12(2)(c)2 and 2, rest periods less than thirty minutes must be counted as time worked. Id. at 2. The plaintiff notes that the court does not delve into the merits at the class certification states but simply determines whether a common question exists. Id. at 4 (citing Amgen v. Conn. Ret. Plans and Tr. Funds, 568 U.S. 455, 459 (2012)). The plaintiff insists that adequacy is satisfied because she is not seeking damages for the days on which she handwrote the times and the *de minimis* defense is neither viable nor unique to the plaintiff. Id. at 7. The plaintiff also argues that the defendants have failed to identify a single individual issue that would predominate over common questions of liability. Id. at 9.

42

B.    Analysis

Class certification requires the plaintiff to establish that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Additionally, the plaintiff must meet at least one of the criteria under Fed. R. Civ. P. 23(b). "Failure to meet any of the Rule's requirements precludes class certification." Arreola v. Godinez, 546 F.3d 788, 794 (7th Cir. 2008).

The Supreme Court has emphasized that Rule 23 "does not set forth a mere pleading standard." Wal-Mart v. Dukes, 564 U.S. 338, 350 (2011). A party seeking class certification must "be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." Id. The plaintiff must show that she has proven the prerequisites of class certification by a preponderance of the evidence. Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi., 797 F.3d 426, 433 (7th Cir. 2015). The court's analysis must be "rigorous" and will "frequently entail overlap with the merits of the plaintiff's underlying claim . . . because the 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" Comcast Corp. v. Behrend, 569 U.S. 27, 33-34 (2013). Nevertheless, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether

43

the Rule 23 prerequisites for class certification are satisfied." <u>Amgen</u>, 568 U.S. at 466. The merits themselves are "not on the table" at this class certification stage of the litigation. <u>Beaton v. SpeedyPC Software</u>, 907 F.3d 1018, 1025 (7th Cir. 2018).

### 1. *Numerosity*

A plaintiff seeking class certification must show that the proposed "class is so numerous that joinder of all members is impracticable." <u>Dukes</u>, 564 U.S. at 349; Fed. R. Civ. P. 23(a). There is no "magic number" of plaintiffs that make a class so numerous that joinder is impracticable, but "a forty-member class is often regarded as sufficient to meet the numerosity requirement." <u>Mulvania v. Sheriff of Rock Island Cty.</u>, 850 F.3d 849, 859 (7th Cir. 2017). "While 'impracticable' does not mean 'impossible,' a class representative must show 'that it is extremely difficult or inconvenient to join all the members of the class.'" <u>Anderson v. Weinert Enters., Inc.</u>, 986 F.3d 773, 777 (7th Cir. 2021) (citing 7A C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE §1762 (3d ed.)). It is not enough to allege that a class action would make the litigation easier for a plaintiff. <u>Id.</u>

The defendants do not challenge numerosity. They have admitted that thirty Cudahy Place employees were subject to COVID-19 screening requirements and forty-three Cudahy Place employees punched in on the same day less than thirty minutes after punching out. Dkt. No. 97 at 9 (citing Dkt. No. 76-3 at 3). The plaintiff reasons that because 41 Management administered thirty-one facilities in Wisconsin and the same screening requirements and

payroll software applied to all facilities, it is likely that there are hundreds of members in the two subclasses. Id. at 10. The plaintiff also alleges that this makes joinder impracticable, which would be true if the facilities are scattered throughout Wisconsin. Id. If all facilities are considered within each subclass, then the plaintiff could satisfy the numerosity requirement.

### 2. *Commonality and Typicality*

The court has concerns with Rule 23 certification, however, that are highlighted when considering the commonality and typicality requirements. Commonality requires a showing that there are questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). "The claims must depend upon a common contention that is capable of class-wide resolution." Chi. Teachers Union, 797 F.3d at 434 (citing Dukes, 564 U.S. at 359). Determining whether common questions are likely to generate common answers "requires a precise understanding of the nature of the plaintiffs' claims" and may overlap with the merits of the plaintiff's underlying claims. McFields v. Dart, 982 F.3d 511, 515-16 (7th Cir. 2020). The Seventh Circuit has emphasized that the court must be satisfied that there is a policy, which may mean receiving evidence and resolving disputes before deciding whether to certify the class. Bell v. PNC Bank, Nat. Ass'n, 800 F.3d 360 (7th Cir. 2015)

Another requirement, often intertwined with commonality, is typicality. The court must be satisfied that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A "plaintiff's claim is typical if it arises from the same event or practice

45

or course of conduct that gives rise to the claims of the other class members and [is] based on the same legal theory." Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992). The typicality requirement "primarily directs the district court to focus on whether named representatives' claims have the same essential characteristics as the claims of the class at large." De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir. 1983). The requirement of typicality "may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." Id.

The plaintiff argues that she has established commonality and typicality by identifying policies that applied to all facilities run by 41 Management. But the plaintiff has not clearly articulated those policies or otherwise identified policies that have been shown to apply to all facilities run by 41 Management. As noted, the plaintiff has identified two classes:

> All hourly employees who worked at a Wisconsin facility administered by 41 management, LLC during the time period after 41 Management implemented temperature checks and screening questionnaires. or (b) during the time period [sic]

> All hourly employees who worked at a Wisconsin facility administered by 41 Management LLC who, during the time period of January 13, 2019 to the present, ever punched in after a break less than 30 minutes after they punched out for a break.

Dkt. No. 97 at 1. The plaintiff explains that "[t]he proposed class is easily ascertainable as 41 Management's records can be used to determine whether someone continued to work at a Wisconsin facility managed by 41 Management after the COVID screenings were implemented; or ever punched in less than 30 minutes after he or she punched out for a break. Id. at 2. But the plaintiff

46

frames the second class as a "meal deduction" subclass applying to those who "punched in after a meal break less than 30 minutes after he or she punched out for the break." Id. at 8. Punching in or out for a meal is different than punching in or out for a break, but even the discovery that the plaintiff filed in support of the motion does not clarify that the plaintiff is seeking to certify a meal break rather than simply a break subclass. Dkt. No. 98-1 at 3.

In arguing that she has satisfied the commonality requirement the plaintiff argues that as to her "meal break claim," 41 Management set up its uniform payroll software "so that when an employee at any Wisconsin facility reported a meal break of less than 30 minutes in duration, the meal punch out and punch in times were each rounded to the nearest quarter hour, and the difference between the rounded punch out and punch in times was deducted from the employee'[s] hours worked." Dkt. No. 97 at 12. In another section of the brief, the plaintiff says the "uniform payroll software is set up so that meal breaks are deducted from worktime even when the meal breaks are 15 minutes or shorter in duration." Id. at 4. In her reply brief, the plaintiff says she is challenging "41 Management's uniform programming of its payroll software to deduct sub-30 minutes meal breaks from its employees' hours worked, unless the break is so short that the nearest quarter to the punch out time is identical to the nearest quarter hour to the punch-in time." Dkt. No. 106 at 2. She asserts that there will be two common questions of law: (1) whether DWD §§272.12(2)(c)1 and 2 require that rest periods of less than thirty minutes must count as hours worked and (2) whether 41 Management demonstrated its

knowledge that individuals punched back in less than thirty minutes after punch out by using the break punch times to calculate compensation.

The plaintiff makes some assumptions that the court was willing to accept for the modest showing required for an opt-in collective; it is not comfortable accepting those assumptions under the more rigorous preponderance-of-the-evidence standard under Rule 23. The plaintiff says that there is no basis for the court to "infer that Cudahy Place employees were the only ones who punched in less than 30 minutes after they punched out for their meal breaks, especially when 41 Management's uniform policy permitted rather than required employees to taken the full 30 minutes for a meal break." Dkt. No. 97 at 13. But it is the plaintiff's burden to show, by a preponderance of the evidence, that something did happen rather than that one may infer that it could have happened. The written policy in the Matthews Senior Living Handbook says that thirty minutes will be deducted for meals; employees must have advance approval from their supervisor to work during part or all of the scheduled meal period. Dkt. No. 57-2 at 30. That stated policy, by itself, is not *per se* unlawful. Essentially, the plaintiff is alleging a uniform practice that was different than the stated policy. But there is nothing in the record establishing that all thirty-one facilities had a uniform practice of forcing (or allowing) hourly employees to take less than thirty minutes for a meal break.

The plaintiff submitted her own time records from Cudahy Place showing that on one occasion—May 22, 2020—one facility run by 41 Management deducted fifteen minutes between 2:00 p.m. and 2:15 p.m. Dkt. No. 97 at 12;

48

Dkt. No. 57-4 at 3. The plaintiff says that another employee at Cudahy Place, Ursula Kendrick, punched out and in between 1:55 p.m. and 2:11 p.m. on March 11, 2021. Dkt. No. 97 at 13. The plaintiff cites to Dkt. No. 57-4 at 3 and "Ho Dec. Ex. 1, pg. 6." Neither of these are Kendrick's time records. Kendrick's record is located at Dkt. No. 76-4 and the cited punch out and punch in times actually occurred on March **10**, 2011. The plaintiff relies on these two occasions—both from Cudahy Place—for her assertion that similar deductions must have happened elsewhere. Dkt. No. 97 at 13.

Ultimately, the plaintiff is asking to certify a meal break subclass for all thirty-one facilities administered by 41 Management based entirely on *her* experience at Cudahy Place. The answer to the interrogatory cited by the plaintiff doesn't support anything more than that. Cudahy Place—not 41 Management—responded to the following interrogatory:

> Identify all instances during the time period of January 13, 2019 to the present in which one of your employees punched in on the same day as, and less than 30 minutes after they last punched out; and not time was deducted from the employee's hours worked on account of the punch out that occurred on the same day as, and less than 30 minutes before the employee punched back in. For each instance identified state the date, the employee involved, each of the employee's punch in times during the day, each of the employee's punch out times during the day, and the total number of hours that the employee was credited as working for the day.

Dkt. No. 98-1 at 3. Cudahy Place objected to the interrogatory as unduly burdensome and irrelevant but then provided examples of seven individuals who clocked out and back in within minutes. It's not clear whether these individuals were clocking out for a meal break; Arianna Scarbrough clocked out at 11:11 p.m. and back in at 11:13 p.m., Janie Patterson clocked out at

49

7:00 a.m. and back in at 7:01 a.m., Stephanie Mitchell clocked out at 11:01 p.m. and back in at 11:07 p.m. on one occasion and out at 6:57 a.m. and back in at 7:00 a.m. on another, Sharon Killion clocked out at 1:390 p.m. and back in at 1:45 p.m. and Angela Hernigle clocked out at 12:55 p.m. and back in at 1:06 p.m. Dkt. No. 98-1 at 3-4. It appears that these individuals worked at Cudahy Place and not at any other facility administered by 41 Management. This evidence is insufficient to establish by a preponderance of the evidence that a practice was allegedly occurring across the defendants' facilities.

Similarly, the plaintiff makes assumptions about an allegedly unlawful COVID-19 screening policy because of her experience at Cudahy Place. At Cudahy Place, employees completed temperature checks and questionnaires before walking to the break room to punch in. 41 Management then rounded the start time based on when the employee punched in rather than when he or she started the screening. The deposition testimony indicated that not all facilities use time clocks—some use tablets and Cudahy Place even allowed paper time sheets. Some of the facilities had employees clock in by the administrator's office and some had a break room; it is not clear where administrators' offices and break rooms were located in the facilities or whether other facilities accounted for the screening time. The plaintiff argues in her reply brief that 41 Management's human resources director "could not think of a single Wisconsin facility where the time clock or tablet was located in the COVID screening area." Dkt. No. 106 at 5. Martell actually testified that she did not know the answer to that question. Dkt. No. 57-8 at 19, Tr. P. 87, lines 17-

50

21. Although a court does not resolve the merits of claims at the class certification stage, the court still must be satisfied that same policy or practice caused an injury to others who could be considered similarly situated. The court is not satisfied based on this evidence.

### 3. *Adequacy*

Rule 23(a)(4) provides that a class certification requires that "the representative parties will fairly and adequately protect the interests of the class." Howard v. Cook Cty. Sheriff's Office, 989 F.3d 587, 609 (7th Cir. 2021) (quoting Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 625 (1997)). The adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." Id. The requirement "also screens for conflicts of interest among class members because the same representative parties cannot adequately represent class members with divergent interests." Id. at 609-10 (citation omitted). But the possibility "that a trivial level of intra-class conflict may materialize as the litigation progresses" does not prevent class certification. Id.

To be an adequate representative, "[a] named plaintiff must be a member of the putative class and have the same interest and injury as other members." Beaton, 907 F.3d at 1027 (citing Conrad v. Boiron, Inc., 869 F.3d 536, 539 (7th Cir. 2017)). The "representative might be inadequate if he is subject to a substantial defense unique to him." Id. at 1027-28 (citing CE Design Ltd. v. King Architectural Metals, Inc., 637 F.3d 721, 726, 728 (7th Cir. 2011)). "Conflicts of interest, as distinct from differences in entitlements, create an

51

issue of adequacy of representation by requiring the class representative to choose between competing class members." Santiago v. City of Chi., 19 F.4th 1010, 1018 (7th Cir. 2021) (citing Johnson v. Meriter Health Servs. Emp. Ret. Plan, 702 F.3d 364, 372 (7th Cir. 2012)).

The defendants point out that the plaintiff does not work for 41 Management; she previously worked for Cudahy Place and generally preferred to use the paper time sheets that deviated from what would have been her actual punch times. Dkt. No. 102 at 7. Although the plaintiff says she won't seek to recover for any of the paper records, the defendants say that her behavior calls into question the accuracy of her time records and "suggests that she may have been intentionally misrepresenting her punch times, or that her punch times are inclusive of COVID screenings." Id. Further, the defendants argue that the plaintiff has not addressed ,and presumably cannot address, the practices at other facilities. Id. The defendants argue that these facts are individualized to each plaintiff and each facility and therefore that the plaintiff is an inadequate representative for the position. Id. at 8.

Again, the burden is on the plaintiff to show by a preponderance of the evidence that she is an adequate representative. The defendants have raised some legitimate questions regarding the plaintiff's status as a former employee of Cudahy Place and her preference for using paper time sheets rather than punching in. Last year, the plaintiff filed a declaration in connection with another motion stating that, when she would arrive at Cudahy Place with other employees, they would complete the questionnaires at about the same time and

52

walk together to punch in. Dkt. No. 75 at ¶2. She acknowledged that she had the responsibility to achieve "the highest possible recovery on the class claims" and to do her best in presenting the case. Id. at ¶6. Those statements alone do not satisfy the adequacy requirement where there are concerns about the plaintiff's ability to represent those employed by other facilities or using other timekeeping methods.

### 4. *Rule 23(b)(3)*

Because the court is not satisfied that the plaintiff has established the Rule 23(a) requirements by a preponderance of the evidence, it is not required to proceed to consideration of Rule 23(b). Rule 23(b)(3) permits class certification only if the questions of law or fact common to class members "predominate" over questions that are individual to members of the class. There is no mathematical or mechanical test for evaluating predominance. See 7AA WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE §1778 (3d ed. 2011). The Supreme Court has discussed predominance in broad terms, explaining that the Rule 23(b)(3) "inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy," with the purpose being to determine whether a proposed class is "sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623. While similar to Rule 23(a)'s requirements for typicality and commonality, "the predominance criterion is far more demanding." Id. at 623-24.

Rule 23(b)(3)'s predominance requirement is satisfied when "common questions represent a significant aspect of [a] case and . . . can be resolved for

53

all members of [a] class in a single adjudication." WRIGHT & MILLER, supra, §1778. Or, to put it another way, common questions can predominate if a "common nucleus of operative facts and issues" underlies the claims brought by the proposed class. In re Nassau Cty. Strip Search Cases, 461 F.3d 219, 228 (2d Cir. 2006) (quoting Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 299 (1st Cir. 2000)). "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005). Individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole. Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 814-15 (7th Cir. 2012). Rule 23(b)(3) does not require common results for members of the class. Id. at 819.

Although the court is not required to consider Rule 23(b), given its conclusion that the plaintiff has not proven the Rule 23(a) requirements by a preponderance of the evidence, the court notes that the defendants argue that there are no class-wide questions of law or fact that will predominate over the questions affecting individual class members because liability will vary with each plaintiff and each facility. Dkt. No. 102 at 9. The defendants identify the following questions that they say are not suited for class treatment:

54

- What information or requirements, regarding meal periods, were communicated to each employee at each facility?

- Whether any particular employee utilized paper time sheets to supplement their time clock punches, either for meal periods or for start times.

- Whether any particular employee accounted for COVID screening time when using paper time sheets.

- How long each employee took to complete the COVID screening.

- As each facility has a different layout and time clocks/tablets are in different locations, how long it took any particular employee to walk from the entrance to the time clock at their location.

Dkt. No. 102 at 9-10. Additionally, the defendants argue that the *de minimis* defense may require individualized assessments. Id.

The court has expressed its concerns regarding the evidentiary gaps in the record relative to any facility other than Cudahy Place. The plaintiff has alleged a practice that differs from the written meal policy that appears to be uniform across facilities. If the plaintiff had proven by a preponderance of the evidence that there was a common unlawful policy or practice across all facilities that was unlawful, she likely would have met her burden. But her proof fails to address a number of issues relating to policies and practices at facilities other than Cudahy Place.

## IV.    CONCLUSION

The court **DENIES WITHOUT PREJUDICE** the defendants' third motion to dismiss. Dkt. No. 90.

55

The court **GRANTS** the plaintiff's motion for conditional certification of the following FLSA collectives:

• All hourly employees who worked at any Wisconsin facility administered by 41 Management during the period on and after March of 2020 (after 41 Management began to require its employees to complete temperature checks and symptoms questionnaires at the beginning of each shift); and

• All hourly employees who worked at any Wisconsin facility administered by 41 Management during the period on or after January 13, 2018, and who had work time deducted when they punched in after a meal break less than 20 minutes after they punched out for the meal break (all those who used the punch clock for meal breaks of less than twenty minutes).

Dkt. No. 94.

The court **ORDERS** that the plaintiff must modify the notice to the collective class as follows:

• In the "TO" section at the top of Page 1, modify the language to read: "All hourly employees who worked at a Wisconsin facility operated by 41 Management, LLC during the time period between January 13, 2018 and January 13, 2021." Dkt. No. 94-2 at 1.

• In the "EFFECT OF JOINING THIS LAWSUIT" section on Page 3, add language informing potential plaintiffs that they may be required to participate in discovery. Dkt. No. 94-2 at 3.

• On Pages 2 and 3 of the notice, change all plural "Plaintiffs" or "Plaintiffs'" to singular "Plaintiff" or "Plaintiff's." Dkt. No. 94-2 at 2-3.

• In the second line of the last paragraph on Page 2, change the word "Froedtert" to the names of the defendants. Dkt. No. 94-2 at 2.

56

The court **DENIES WITHOUT PREJUDICE** the plaintiff's motion for Rule 23 class certification. Dkt. No. 96.

Dated in Milwaukee, Wisconsin this 30th day of September, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**