UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHARLETTA HARWELL-PAYNE,

                    Plaintiff,

                                              Case No. 21-cv-328-pp

        v.

CUDAHY PLACE SENIOR LIVING LLC
and 41 MANAGEMENT LLC

                    Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT (DKT. NO. 108), GRANTING PLAINTIFF'S EXPEDITED MOTION FOR RECONSIDERATION (DKT. NO. 115), GRANTING IN PART PLAINTIFF'S MOTION TO REOPEN DISCOVERY (DKT. NO. 116) AND REQUIRING PARTIES TO FILE JOINT STATUS REPORT**

Plaintiff Charletta Harwell-Payne, who worked as a Med Aide at the Cudahy Place Senior Living memory care facility, brought this individual, collective and class action in the Western District of Wisconsin under the Fair Labor Standards Act (FLSA) and Wisconsin wage law. Dkt. No. 1. After the defendants filed a motion to transfer venue to this district, dkt. no. 5, and a partial motion to dismiss, dkt. no. 10, the plaintiff filed an amended complaint, dkt. no. 23, followed five days later by a motion to amend the complaint, dkt. no. 25; the defendants responded with a second partial motion to dismiss, dkt. no. 29, and a second motion to transfer venue, dkt. no. 32. On March 15, 2021, Chief Judge Peterson granted the defendants' motion to transfer the case to this district, without ruling on the motion to dismiss. Dkt. No. 48. The

1

plaintiff then filed an additional three motions: a motion to file a second amended complaint, dkt. no. 53, a motion to determine the adequacy of discovery responses, dkt. no. 54, and a motion to certify the class, dkt. no. 55. This court denied the defendant's second partial motion to dismiss, granted the plaintiff's motion for leave to file a second amended complaint, denied without prejudice the plaintiff's motion to determine the adequacy of the responses and denied without prejudice the motion to certify the class. Dkt. No. 89. The second amended complaint was docketed as the operative complaint. Dkt. No. 87.

The parties soon filed another round of motions. On September 30, 2022, the court denied without prejudice the defendants' third partial motion to dismiss, dkt. no. 90, granted the plaintiff's motion for conditional certification of FLSA collectives, dkt. no. 94, and denied without prejudice the plaintiff's motion for Rule 23 class certification, dkt. no. 96. Dkt. No. 113. At the time the court ruled, the plaintiff had filed an individual motion for summary judgment, dkt. no. 108, and the parties were in the process of briefing that motion. That motion has been fully briefed for some time.

As of the date of this order, the second amended complaint is operative. Dkt. No. 87. It asserts a claim for unpaid minimum wage and overtime pay under the FLSA as to the plaintiff individually. Id. at 9 (Count I). It asserts a claim for unpaid wages under Wisconsin law as to the plaintiff individually. Id.

at 10. It asserts FLSA claims on behalf of two collectives.[1] Currently, the collectives consist of hourly employees who worked at any Wisconsin facility administered by 41 Management: (1) during the period on or after March of 2020 (after 41 Management began to require its employees to complete temperature checks and symptoms questionnaires at the beginning of each shift); and (2) during the period on or after January 13, 2018, and who had work time deducted when they punched in after a meal break less than twenty minutes after they punched out for the meal break (all those who used the punch clock for meal breaks of less than twenty minutes). Dkt. No. 113 at 56. Finally, the second amended complaint contains Rule 23 class allegations, dkt. no. 87 at 8, but the court has denied all motions to certify a class.

The court has not ruled on the plaintiff's motion for summary judgment, dkt. no. 108, and since filing it the plaintiff also has filed an expedited motion for reconsideration of the court's ruling limiting collective class members to the period between January 13, 2018 and the filing of the amended complaint on January 13, 2021, dkt. no. 115. The plaintiff has moved to reopen discovery until thirty days after the deadline for potential collective members to opt into the conditionally certified collective action. Dkt. No. 116. A footnote in the motion to reopen discovery explains that the plaintiff cannot determine the deadline for potential collective members to opt into the collective action until the court has ruled on the motion for reconsideration. Dkt. No. 116 at n.1. The

---

[1] To avoid confusion, the court will continue to use the singular "the plaintiff" to refer to the claims and motions of both the named plaintiff and the collectives.

Case 2:21-cv-00328-PP   Filed 03/28/24   Page 3 of 53   Document 128

defendants filed opposition briefs to each of the three pending motions. Dkt. Nos. 118, 119, 122.

The court will grant in part and deny in part the plaintiff's motion for summary judgment, grant the plaintiff's motion for reconsideration, grant in part the plaintiff's motion to reopen discovery and require the parties to file a status report.

## I.    Plaintiff's Motion for Summary Judgment (Dkt. No. 108)

The plaintiff's motion for partial summary judgment (Dkt. No. 108) covers many of the issues addressed in the court's order denying without prejudice the defendants' third motion to dismiss and certifying the collective class (Dkt. No. 113). She asks the court to rule, as a matter of law, on the questions that she believes are significant to the resolution of the case. First, she wants the court to declare that 41 Management was her employer under the FLSA and Wisconsin law because 41 Management exercised control over her working conditions. Dkt. No. 108 at 1. Second, she asks the court to rule that her COVID-19 screenings and temperature checks constituted her first principal activity each day. Id. Third, she asks for a ruling that the defendants' *de minimis* defense fails as a matter of law. Id. at 2. Fourth, she seeks a declaration that 29 C.F.R. §785.18 creates a bright-line rule so that breaks of twenty minutes or less count as hours worked under the FLSA and breaks of less than thirty minutes are rest periods that must be included in hours worked under Wisconsin law. Id. at 2.

A.    Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

5

B.    Material Facts

The plaintiff worked as a Med Aide at the Cudahy Place Senior Living facility in Cudahy, Wisconsin. Dkt. No. 124 at ¶¶1, 2. The position summary for a Med Aide (prepared by Matthews Senior Living) states as follows:

> Responsible for Resident services and other duties as assigned, delegating duties appropriate to the other staff and volunteers as appropriate. Duties include medication administration, personal services, housekeeping, laundry, social-recreational activities, delegated tasks, meal services and others as need for Resident well-being.

Dkt. No. 110-2 at 1.

1.    *Hiring Practices*

41 Management, LLC provides various services to Cudahy Place and other assisted living facilities in Wisconsin, including recruitment, employment policies, position descriptions and human resources functions. Dkt. Nos. 87, 92 at ¶¶8, 9, 10, 13. For example, 41 Management hired the current associate administrator for Cudahy Place. Dkt. Nos. 87, 92 at ¶8. Generally, prospective employees submit applications through a website managed by 41 Management, LLC. Id. at ¶9. But 41 Management does not have to sign off any time that Cudahy Place hires a new employee. Dkt. No. 58 at 3, Tr. p. 8, lines 23-25.

41 Management requires each of its Wisconsin facilities to distribute a Matthews Senior Living employee handbook to all employees, up to the facility's administrator, at each facility—with no right to make changes to the handbook prior to distribution. Dkt. Nos. 87, 92 at ¶10. The handbook states that Matthews Senior Living maintains a personnel file for each employee and that the employee may ask to review her own personnel file. Dkt. No. 57-2 at 12 (p.

6

7 of the handbook). The handbook contains the general rules that govern the terms and conditions of employment; sets out attendance and disciplinary rules for all employees; defines employee benefits, pay policies and leave policies applicable to all employees; and contains rules that govern safety in the workplace. Dkt. No. 120 at ¶6. The handbook also sets out dates when regular and final paychecks will be issued to employees. Id. at ¶7.

41 Management provided position descriptions; the individual nursing homes did not have the right to make changes to the document before it was given out to employees. Dkt. No. 58 at 12, Tr. p. 57, lines 9-24. 41 Management also distributes job procedure documents that define how the employees should perform their work, such as how they should check blood sugar for residents. Dkt. No. 120 at ¶11. Individual facilities have no right to change the position descriptions or the job procedures. Id. at ¶12.

Time records for employees at the individual facilities are forwarded to 41 Management, where the same controller uses uniform payroll software to compute payroll for employees at each facility. Id. at ¶13. 41 Management Chief Financial Officer Ross Weaver probably answered the set-up questions for the payroll software. Id. at ¶14. The software is set up so that if someone punches out for a break, the time is deducted until they punch back in, even if the time is fifteen minutes or less. Dkt. No. 58 at 15-16, Tr. p. 77, lines 19-25; Tr. p. 78, lines 1-7.

41 Management approved the plaintiff's discharge and all wage rate increases at Cudahy Place. Dkt. No. 120 at ¶13. However, 41 Management's

7

regional director of operations would not be notified of the starting wage of each employee. Dkt. No. 58 at 7, Tr. p. 26, lines 1-3.

> 2. *COVID-19 Screening*

With the rise of the COVID-19 pandemic, 41 Management implemented a policy in spring 2020 requiring "staff and HCW" and visitors to Cudahy Place to complete a temperature check and a brief screening as they entered the building. Dkt. Nos. 87, 92 at ¶31. 41 Management believed the Wisconsin Department of Health Services required the screening policy. Dkt. No. 57-9 at 5, Tr. p. 22, lines 24-25; Tr. p. 23, lines 1-7.

The COVID-19 Screening Questionnaire explained that "[a]s part of our action plan in response to COVID-19 it is essential to prevent the spread of infection by screening employees and visitors for symptoms upon arrival at the community." Dkt. No. 57-3 at 1. The stated purpose was to "reduce the spread of COVID-19 and other communicable diseases." Id. The procedure required "employee and visitor" to complete the entire questionnaire (two questions) prior to arrival for each visit, including a temperature check. Id.

The entire questionnaire appears below:

8



**9.2F Prevent COVID-19:**
**Screening Checklist (Staff and HCW)**

COVID-19 is extremely dangerous for seniors with early estimates of a **15% mortality rate** for older adults 80+ years old. Many populations outside of the elderly do not show any symptoms but are able to transmit the virus.

1.
      Do you have or have you had any of the following symptoms in the last   YES  NO
      14 days? (Circle any present symptoms)

| Fever/Chills | Sore Throat | Cough |
|---|---|---|
| NEW Shortness of breath | Headache | Muscle or body aches |
| Loss of taste and/or smell | Congestive or runny nose | Fatigue |
| Any GI issues or symptoms | Nausea | Vomiting |

Temperature (must be checked at community): _____

2.  **Have you:**
      Traveled internationally within the last 14 days to areas where COVID-   YES  NO
      19 cases have been confirmed or been in close contact with
         persons who have
      Had direct contact with anyone who has had confirmed COVID-19 cases   YES  NO
         in the last 14 days.

Name of Resident being visited: _____

Your Name: _____    Date: _____

Phone Number (required): _____

Active Screening Completed By: (staff initials) _____

***DO NOT WRITE BELOW THIS LINE – ADMINISTRATION USE ONLY***

Reviewed by: _____    Title: _____

Signature: _____    Date: _____

Policy 9.2F  10.2020

DEF000078

Id. at 2.

Screening for both employees and visitors took place at the front desk. Dkt. No. 58 at 18, Tr. p. 85, lines 2-6. Many employees took their own temperature with a hand-held thermometer. Id. at 20, Tr. p. 91, lines 3-8. At Cudahy Place, after a temperature check and completion of the screening questionnaire, an employee would walk maybe 100 to 200 feet from the screening area to punch in using a tablet or a time clock. Id., Tr. p. 90, lines

10-13; Dkt. No. 120 at ¶17. In 41 Management facilities, the tablets/time clocks were in either the employee breakroom or next to the administrator's office, rather than in the front area where employees answered the questionnaire and completed the temperature checks. Id. at ¶18.

          3.   *Meal Breaks*

41 Management set up its payroll software so that if an employee punched out for a break the time was deducted until the employee punched back in. Dkt. No. 58 at 15-16, Tr. p. 77, lines 15-25; Tr. p. 78, lines 1-7. The handbook required employees to punch out for meal periods, but not for breaks. Dkt. No. 57-2 at 30. An employee was expected to work up until the time she walked toward the time clock or tablet to punch out and resume work as soon as she punched back in. Dkt. No. 58 at 15, Tr. p. 75, lines 3-12. The plaintiff was paid for 5.5 hours based on work performed on May 8, 2020 from 8:23 a.m. to 1:58 p.m., and was paid for an additional hour based on work performed from 2:20 p.m. to 3:22 p.m. Dkt. No. 57-4 at 2. On May 22, 2022, the plaintiff was paid for 13.25 hours (8 hours at regular rate, 5.25 hours of overtime) for work performed from 8:00 a.m. to 2:00 p.m., 2:15 p.m. to 5:30 p.m. and from 6:00 p.m. to 10:00 p.m. Dkt. No. 57-4 at 3. The plaintiff's regular hourly pay rate was $13.9100, and her overtime hourly pay rate was $20.8650. Id.

41 Management set up the software system so that if someone punched back in after a break of fifteen minutes or less, the time would be deducted.

10

Dkt. No. 58 at 15-16, Tr. p. 77, lines 19-25; Tr. p. 78, lines 1-7. There was, however, a policy in the handbook regarding interrupted meal breaks:

Q At the Cudahy Place, if an employee were to sign out or punch out for a meal break, if she was interrupted during that meal break what was she supposed to do?

A Inform her supervisor and get approval to go back early.

Q What do you mean go back early?

A To leave their break.

Q So she was supposed to—she was supposed to contact the supervisor to get approval to punch back in immediately?

A Uh-huh.

Q "Yes"?

A Yes.

Q Okay. And then what was going to happen—what was supposed to happen for the break time—

A For the time that they weren't working?

Q Right.

A They wouldn't get paid.

Q So if the meal break was interrupted after 15 minutes and the employee punches in after 15 minutes, that 15 minutes still would have been unpaid?

A Correct.

Q And how would you expect employees to be instructed that if there was a break—if their meal break was interrupted they were supposed to get permission to punch back in?

A It's in the employee handbook.

11

Dkt. No. 58 at 20, Tr. p. 92, lines 13-25; Tr. p. 93, lines 1-16; Dkt. No. 57-2 at 30 ("Employees must receive advance approval from their supervisor to work during part or all of a scheduled meal period.").

      C.    <u>Joint Employer</u>

          1.    *Parties' Arguments*

              a.    Plaintiff's Brief (Dkt. No. 109)

The plaintiff first argues that 41 Management was her employer under the FLSA and Wisconsin law. Dkt. No. 109 at 1. Beginning with the FLSA, the plaintiff argues that the court must consider whether 41 Management exercised control over some working conditions. <u>Id.</u> at 5-6 (citing <u>Moldenhauer v. Tazewell-Pekin Consolidated Commc'n Center</u>, 536 F.3d 640, 644 (7th Cir. 2008)). The plaintiff argues that 41 Management "suppl[ied] the position description, individual tasks descriptions and the Matthews Employee Handbook to individual Wisconsin Facilities." <u>Id.</u> at 6. The plaintiff further argues that

> 41 Management controlled what educational, experience, and employment requirements Plaintiff had to fulfill to become employed, what work tasks Plaintiff should perform, the procedures that Plaintiff should undertake to perform those work tasks, as well as more generally rules that govern Plaintiff's employment such the characterization of her as an at-will employee, attendance and disciplinary rules, benefits, pay, and leave available to her, when paychecks will be issued to her, and the facility's obligation to maintain a personnel file for her. Additionally, 41 Management rather than the individual facilities was responsible for computing Plaintiff's hours worked and compensation. 41 Management must also approve the Plaintiff's termination and wage increases.

<u>Id.</u> at 6 (citations to record omitted).

Case 2:21-cv-00328-PP   Filed 03/28/24   Page 12 of 53   Document 128

The plaintiff also argues that 41 Management is liable for Cudahy Place's violations under Wisconsin law because it had the right to control an aspect of the operations that caused the violations: the payroll system. Id. at 6 (citing Lang v. Lion's Club of Cudahy Wis., Inc., 390 Wis. 2d 627 (Wis. 2004)). The plaintiff maintains that 41 Management "was responsible for programming uniform software, so that meal breaks regardless of duration were deducted from its employees' hours worked." Id. at 7. The plaintiff asserts that "41 Management set up policies so that if an employee's meal break was interrupted, the employee was supposed to obtain permission punch back in immediately, leaving the time period between the beginning of the employee's meal break and when the employee punched back in unpaid, even if said time period was only 15 minutes long." Id. Finally, the plaintiff asserts that 41 Management was "responsible for hours computing employees' hours worked and compensation after it required its employees to undergo COVID-19 screenings." Id.

b.    Defendants' Opposition (Dkt. No. 119)

The defendants respond that 41 Management does not qualify as a joint employer; it does not have an employment relationship with the plaintiff. Dkt. No. 119 at 1. They, too, cite Moldenhauer, in which the Seventh Circuit refused to find a joint employer relationship where the plaintiff could not identify an instance of the alleged employer hiring an employee, determining working conditions or deciding compensation. Id. at 3 (citing Moldenhauer, 536 F.3d at 644). The defendants accuse the plaintiff of placing too much emphasis on the

13

employee handbook, arguing that merely supplying the handbook does not demonstrate control over the plaintiff's working conditions. Id. at 4 (citing Mayer v. Waste Mgmt., Inc., Case No. 21-cv-0984, 2022 WL 1213008, *4 (E.D. Wis. 2022)). The defendants argue that the plaintiff offers no other evidence that 41 Management hired hourly employees, controlled starting wages or otherwise had input in personnel decisions or directed day-to-day activities of employees. Id. at 4-5.

> c.    Plaintiff's Reply (Dkt. No. 123)

The plaintiff replies that the defendants controlled her wage range and any wage increases, monitored attendance and enforced discipline, detailed work procedures, calculated compensation and maintained employment records. Dkt. No. 123 at 1. She argues that 41 Management directed control of some of the working conditions, id. at 4, and that 41 Management's human resource manager approved the decision to terminate the plaintiff's employment, dkt. no. 120 at ¶2. Finally, she claims that 41 Management programmed the software to deduct from time worked meal breaks shorter than thirty minutes, implemented the COVID-19 screening policy and computed the payroll. Dkt. No. 123 at 4.

> 2.    *Analysis*

> a.    Federal Law

The Department of Labor has promulgated regulations identifying situations that may give rise to a joint employment relationship:

(a) Where two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be

14

joint employers under FMLA. Joint employers may be separate and distinct entities with separate owners, managers, and facilities. Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:

> (1) Where there is an arrangement between employers to share an employee's services or to interchange employees;
>
> (2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or,
>
> (3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. §825.106(a).

The Seventh Circuit has opined that this regulation does not offer much guidance in setting the parameters of a joint employment relationship. Moldenhauer, 536 F. 3d at 644. It has held that each alleged employer "must exercise control over the working conditions of the employee, although the ultimate determination will vary depending on the specific facts of each case." Id. The Seventh Circuit considers factors enumerated by the Ninth Circuit in Moreau v. Air France, 343 F.3d 1179, 1183 (9th Cir. 2003) to be "certainly relevant," but has declined to limit its review to those factors. Id. The relevant factors include whether the defendant (1) had the power to hire and fire the employee; (2) supervised and controlled the employee's work schedule or conditions of payments; (3) determined the rate and method of payment; and (4) maintained employment records. Id.

15

There is no evidence that 41 Management had the power to hire the plaintiff. 41 Management hired the associate director of the Cudahy Place, and the associate director had responsibility for hiring hourly employees. It appears, however, that the regional director of 41 Management gave the approval for the plaintiff's supervisor to terminate the plaintiff. There is no evidence that 41 Management directly supervised the plaintiff's work schedule. There *is* evidence that 41 Management set policies through the employee handbook, identified the tasks performed by a Med Aide, set the rules governing attendance and benefits and set up the payroll software and managed when paychecks would be issued. There is no evidence that 41 Management set the plaintiff's starting salary, but 41 Management set the wage range for hourly employees and determined when paychecks would be issued. There is no evidence that 41 Management maintained the plaintiff's employment records. The plaintiff relies on a statement in the handbook that says that Matthews Senior Living would maintain a personnel file for each employee.

The plaintiff asks the court to find, as a matter of law, that 41 Management exercised control over her employment. She relies almost exclusively on the employee handbook and a few excerpts from deposition testimony, but provides little evidence about how 41 Management supervised her working conditions. 41 Management didn't hire the plaintiff and doesn't appear to have had input as to the plaintiff's schedule. 41 Management didn't set her starting salary and there is no evidence that anyone from 41

16

Management gave the plaintiff a raise. Matthews Senior Living may have maintained personnel files according to the handbook but there is nothing in the record that says that 41 Management maintained the plaintiff's personnel file. And the plaintiff has moved for partial summary judgment on her individual claims but has asked the court to certify a collective for all hourly employees employed by 41 Management. On these facts, the court will not grant summary judgment in favor of the plaintiff on the question of whether 41 Management was the plaintiff's joint employer under the FLSA.

b.    State Law

The second amended complaint alleges that "[b]y failing to pay to the Plaintiff all straight time and overtime wages required by the parties' agreement as well as Wisconsin's wage and hour statutes within 31 days of when the work was performed, Defendants violated Wis. Stat. §109.03(1) . . . ." Dkt. No. 87 at ¶60. Again, the plaintiff has alleged that 41 Management was her "employer." Wis. Stat. §109.01(2) defines an "employer" as "any person engaged in any activity, enterprise or business employing one or more persons within the state . . . ."

The plaintiff argues that "Wisconsin law holds one entity liable for a second entity's violations of the law when the first entity had the right to control the aspects of the second entity's operation that caused the violations." Dkt. No. 109 at 6 (citing Lang, 390 Wis. 2d at 645). But Lang does not involve Wis. Stat. §109.01; it is a discussion of Wisconsin's law governing when a principle is liable for the conduct of an agent. The plaintiff also cites Kerl v.

17

Dennis Rasmussen, Inc., 273 Wis. 2d 106 (Wis. 2004). Id. In Kerl, the Wisconsin Supreme Court held that "a franchisor may be held vicariously liable for the tortious conduct of its franchisee only if the franchisor has control or a right of control over the daily operation of the specific aspect of the franchisee's business that is alleged to have caused the harm." Kerl, 273 Wis. 2d at 113.

Judge Barbara Crabb of the Western District of Wisconsin observed in Flecha v. Metal Sys., LLC, Case No. 16-cv-800, 2017 WL 4621634, at 6 (W.D. Wis. Oct. 16, 2017) that "[o]ther judges" in the Western District had treated the inquiry of whether an entity is an "employer" "under Wisconsin wage and hour law as substantially similar to the inquiry under the Fair Labor Standards Act." (citing Pope v. Espeseth, Inc., 228 F. Supp. 3d 884, 891 (W.D. Wis. 2017) (Wisconsin wage statutes' employer "definitions are similar to the definition of employer under the FLSA," and "require at least as much of a showing of control as the FLSA") (citing Mays v. Grand Daddy's, LLC, Case No. 14-cv-461, 2015 WL 4373565 (W.D. Wis. July 15, 2015)). This court has implied the same. See Montana v. JTK Restorations, LLC, Case No. 14-C-487, 2015 WL 5444945, at *2 (E.D. Wis. Sept. 14, 2015) (finding that Wis. Stat. §109.01(2)'s definition of "employer" is similar to the FLSA's definition).

In Pope, Judge Peterson of the Western District rejected the plaintiffs' argument that in determining whether an entity was their "employer" under §109.01(2), "the court should use the test for respondeat superior liability of a franchisor, see Kerl v. Dennis Rasmussen, Inc., 2004 WI 86, ¶43, 273 Wis.2d 106, 682 N.W.2d 328, or the test for independent contractor status, see Wittka

18

*v. Hartnell*, 46 Wis.2d 374, 382-83, 175 N.W.2d 248 (1970)).” <u>Pope</u>, 228 F. Supp. 3d at 891. Judge Peterson stated that the court would not “overlook the statutory language forming the basis of plaintiffs’ claims in favor of court-created tests applicable to common law torts or other statutory provisions” when the plain language of the Wisconsin statute “require[d] at least as much of a showing of control as the FLSA.” <u>Id.</u> The plaintiff asks this court to do exactly that, by relying on cases discussing principle/agent and franchisor/franchisee liability rather than on the definition in §109.01(2). Like Judge Peterson, this court declines to eschew the definition in the statute and adopt tests relating to other torts or statutes.

Because the plaintiff has failed to demonstrate that 41 Management was the plaintiff’s joint employer under the FLSA, it follows that she has failed to demonstrate that it was her joint employer under Wisconsin law. The court will not grant summary judgment in the plaintiff’s favor on that question.

      D.    <u>COVID-19 Screening: Principal Activity and the *De Minimis* Defense</u>

          1.    *Parties’ Arguments*

              a.    Plaintiff’s Brief (Dkt. No. 109)

The plaintiff argues that, based on her day-to-day interactions with elderly residents were vulnerable to COVID-19, her COVID screenings and temperature checks were necessary to her ability to work safely and effectively. Dkt. No. 109 at 1. She reasons that the preliminary screenings were integral and indispensable to a principal activity and therefore necessary for her job. <u>Id.</u> at 8 (citing the Department of Labor’s guidance, https://www.dol.gov/

19

agencies/whd/flsa/pandemic#4). She concedes that no statute or regulation defines when time spent undergoing COVID-19 screenings constitutes hours worked, but she argues that it was a principal activity for a Med Aide who was administering medicine and performing personal services for elderly residents. Id. at 9-11. She further argues that the COVID-19 screening was indispensable because it was the chosen method for complying with DHS §132.42(4). Id. at 12.

The plaintiff also argues that the *de mininis* defense fails as a matter of law. Id. at 13. The screening policy required the plaintiff to complete the screening, take her temperature and walk from the front desk area to the time clock (about 100 to 200 feet away). Id. The plaintiff argues that the defendants' practice of rounding to the nearest quarter hour meant they rounded to the nearest quarter hour when she punched in rather than when she started screening. Id. She believes this rounding undercut the amount of time by as much as fifteen minutes. Id. at 13-14. The plaintiff cites a decision from the Tenth Circuit in which the court held that a loss of 2.27 minutes per day is not *de* minimis. Id. at 15 (citing Peterson v. Nelnet Diversified Solutions, LLC, 15 F.4th 1033, 1043-49 (10th Cir. 2021)). She estimates that over a year, with approximately 250 punch-ins, an employee would lose 500 minutes or 8 and 1/3 hours. Id.

b.      Defendants' Response (Dkt. No. 119)

The defendants respond that pre-work COVID-19 screening was not integral to the plaintiff's principal activities as a Med Aide. Dkt. No. 119 at 5.

20

The defendants distinguish integral from indispensable, arguing that
"indispensable" means necessary, while "integral" means essential to
completeness or "composed of constituent parts making a whole." Id. at 7. The
defendants say that "[a]ctivities which are 'indispensable' to a principal activity
are not necessarily also 'integral.'" Id. (citing IBP, Inc. v. Alvarez, 546 U.S. 21,
40-41 (2005)). They note that everyone—employees and visitors—who entered
the Cudahy Place during the relevant period had their temperature checked
and completed a questionnaire. Id. at 8-9.

As for the *de minimis* defense, the defendants argue that courts have not
imposed rigid rules that can be applied with mathematical certainty as to when
the rule applies. Id. at 9 (citing Frank v. Wilson & Co., 172 F.2d 712, 716 (7th
Cir. 1949)). The defendants cite case law in which ten minutes was deemed *de
minimis* even though otherwise compensable, E.I. du Pont De Nemours & Co. v.
Harrup, 227 F.2d 133, 135-36 (4th Cir. 1955); Green v. Planters Nut &
Chocolate Co., 177 F.2d 187, 188 (4th Cir. 1949), and two to fifteen minutes
was deemed "negligible and not compensable," Carter v. Panama Canal Co.,
314 F. Supp. 386, 392 (D.D.C. 1970), aff'd, 463 F.2d 1289 (D.C. Cir.), cert.
denied, 409 U.S. 1012 (1972).

c.    Plaintiff's Reply (Dkt. No. 123)

The plaintiff replies that 41 Management does not dispute that COVID-
19 screenings were indispensable to the plaintiff's principal activity of providing
care as a Med Aide. Dkt. No. 123 at 1, 8. She says that the only issue is
whether the COVID-19 screenings were "integral" because they reduced the

21

risk that plaintiff would spread COVID-19 to residents. Id. at 1. The plaintiff argues that the defendants can't change a principal activity into a preliminary activity simply by making everyone—all employees and visitors—undergo the same procedure. Id. at 9.

The plaintiff adds that the *de minimis* defense fails because the defendants have not proffered any evidence that would allow a fact finder to sustain the defense. Id. at 1-2. She asserts that the defendants forfeited the defense by rounding all punches to the nearest quarter hour. Id. at 10. She argues that a case from the Northern District of Indiana, Koch v. Bailey Trucking, 482 F. Supp. 3d 784, 798 (N.D. Ind. 2020)—holding that rounded time should be used to count underreporting—is binding on this court. Id. at 10. She asserts that the "modern" *de minimis* doctrine codified by the Department of Labor is stricter than the doctrine cited by the defendants. Id. at 11 (citing Sandifer v. U.S. Steel Corp., 571 U.S. 220, n.8 (2014)). According to the plaintiff, the defendants have no evidence that completing the screening and punching in took "a couple minutes or less." Id. at 11-12.

         2.    Analysis

The court addressed this issue at length in its prior order. Dkt. No. 113 at 13-19. As the court explained, the FLSA applies only to an employee's principal activity and the workday begins when an employee commences that activity. Chagoya v. City of Chicago, 992 F.3d 607, 617-18 (7th Cir. 2021). A principal activity includes all activities that are "integral and indispensable" to the activities the employee is hired to perform. Id. at 618; 29 C.F.R. §790.8(b).

22

The FLSA does not apply to an employee's preliminary or postliminary activity. Chagoya, 992 F.3d at 617. A "preliminary activity" is "an activity engaged in by an employee before the commencement of his 'principal' activity or activities." 29 C.F.R. §790.7(b).

In its prior order, the court discussed Supreme Court and Seventh Circuit case law carving out the boundaries of what is integral and indispensable. Dkt. No. 113 at 13-14. The Seventh Circuit affirmed a district court's order denying summary judgment to officers on a SWAT unit who wanted to be compensated for time spent transporting, loading and unloading equipment to and from their residences. Chagoya, 992 F.3d at 610. In ruling that these activities were not integral and indispensable but preliminary and postliminary, the Seventh Circuit explained:

> [E]ven in the absence of these supportive cases from our sister circuits, we still would conclude that applicable Supreme Court precedent and consonant Department of Labor interpretive statements require the conclusion that the off-duty transportation, loading and unloading, and storage of SWAT equipment simply is not integral and indispensable to SWAT operators' principal activities. Certainly, as the operators maintain, the record supports the assertion that the SWAT unit must respond quickly in the event of a call-out. The record does not support the conclusion, however, that the operators could not perform their principal duties without bringing their equipment home . . . . The CPD requirement that certain equipment not be left in the vehicle but stored in the residence is nothing more than a reasonable directive that its officers take the precautions necessary to ensure the safe and secure storage of the weapons and equipment. This activity is very far removed, both logically and practically, from the operators' principal activity of handling critical incidents. It is simply designed to protect the public and ensure that Chicago-owned dangerous equipment is not used abusively.

Id. at 622-23.

23

Requiring a Med Aide to undergo COVID-19 screenings before entering a senior living facility during a pandemic arguably is different than the time spent securing equipment at home by a member of the SWAT team. The position summary of the Med Aide includes medication administration, personal services, meal services and "others as needed for Resident well-being." Dkt. No. 110-2 at 1. One of the stated requirements was to be "free of non-treated communicable disease." Id. at 2. Screening for COVID-19 was not far removed—either logically or practically—from a Med Aide's principal activity of caring for the residents' well-being.

As the court observed in its prior order, neither the United States Supreme Court nor the Seventh Circuit has weighed in on COVID-19 screenings or temperature checks. Dkt. No. 113 at 14. Various courts around the country have reached different conclusions, but none involved a Med Aide working in a senior living facility during the pandemic. The Southern District of California found that a COVID-19 screening was not a principal activity for employees hired to transport automobile parts from the distribution center throughout Southern California. Pipich v. O'Reilly Auto Enters., LLC, Case No. 21cv1120, 2022 WL 788671, *2 (S.D. Cal. March 15, 2022). Similarly, COVID-19 screenings were not integral and indispensable to the principal duties of a Walmart employee who was hired to stock, unload, assist customers, work the cash register, and greet customers. Perez v. Walmart, Inc., Case No. 21-cv-00120, 2021 WL 5741484, *4 (W.D. Mo. Oct. 25, 2021). However, an Eastern District of California court held that COVID-19 screenings were integral and

24

indispensable for Amazon employees working in a warehouse to keep the virus from spreading in fulfillment centers to other employees or products. Boone v. Amazon.com Services, LLC, Case No. 21-cv-00241, 562 F. Supp. 3d 1103, 1118 (E.D. Cal. 2022).

The plaintiff continues to rely on the FAQ section from the Department of Labor website, which is neither binding nor accorded deference. Dkt. No. 109 at 8 (citing https://www.dol.gov/agencies/whd/flsa/pandemic#4). As the court explained it its prior order, the answer to Question No. 4 is illustrative. ("My employer requires all employees to take their temperature to try to screen for people who might have COVID-19 before entering the job site. Do I need to be paid for the time spent taking my temperature?"). The Department of Labor acknowledged that whether COVID-19 temperature checks are compensable will depend on the job position and whether the check is "necessary for the work you do." It explains:

> For many employees, undergoing a temperature check before they begin work must be paid because it is necessary for their jobs. For example, if a nurse who performs direct patient care services at a hospital is required to check her temperature upon arrival at the hospital before her shift, the time that she spends checking her temperature upon entry to the worksite is likely compensable because such a task is necessary for her to safely and effectively perform her job during the pandemic. In other words, the check is integral and indispensable to the nurse's job.

> COVID-19 and the Fair Labor Standards Act Questions and Answers, https://www.dol.gov/agencies/whd/flsa/pandemic, (last visited October 4, 2022).

Dkt. No. 113 at 17.

25

The position description suggests that the COVID-19 screening of a Med Aide during the pandemic was integral and indispensable to that position. The COVID-19 questionnaire stated that COVID-19 was extremely dangerous for seniors, including an early estimated fifteen percent fatality rate for those who were over eighty years of age. Dkt. No. 120 at ¶21; 57-3 at 2. That, in combination with the position summary, position responsibilities and employment requirements—staying free of communicable diseases— demonstrates that the screening was closely related to the performance of the duties of a Med Aide. The court will grant the plaintiff's motion for summary judgment on this issue, concluding that the time spent on screening of a Med Aide for COVID-19 during the pandemic was integral and indispensable to that position.

While a preliminary activity can be integral and indispensable, it still may not compensable if the time spent on the screening activities is *de minimis*. "The *de minimis* doctrine allows employers to disregard otherwise compensable work when only a few seconds or minutes of work beyond the scheduled working hours are in dispute." Kellar v. Summit Seating, Inc., 664 F.3d 169, 176 (7th Cir. 2011) (citing Singh v. City of New York, 524 F.3d 361, 370 (2d Cir. 2008)). When evaluating whether work performed by an employee is *de minimis*, courts typically consider the amount of time spent on the extra work, the practical administrative difficulties of recording additional time, the regularity with which the additional work is performed and the aggregate

26

amount of compensable time. Id. (citing Lindow v. United States, 738 F.2d 1057, 1062-63 (9th Cir. 1984); 29 C.F.R. §785.47).

There is nothing in the record beyond speculation about how much additional time the plaintiff spent on the COVID screening. The questionnaire required the plaintiff to answer two questions (do you have any of the symptoms and have you traveled or had direct contact with anyone who has confirmed COVID?) and complete a temperature check. Dkt. No. 60-2 at 1. Once the plaintiff completed a temperature check, she walked "maybe 100 to 200 feet maximum" to the breakroom to punch in. Dkt. No. 58 at 20, Tr. p. 90, lines 10-13. There is no evidence of how long this process took. The plaintiff apparently believes the duration doesn't matter, arguing that the defendants forfeited the *de minimis* defense by choosing to round to the nearest quarter hour. Dkt. No. 109 at 14. The plaintiff uses a mathematical formula to conclude that, if it takes two minutes to complete the screening and walk to the clock, she lost 500 minutes each year with 250 punch-ins. This in turn would translate to $116 in straight time pay ("easily exceeding $125 per year once overtime pay is counted"). Dkt. No. 109 at 15.

The defendants have the burden of establishing that the *de minimis* defense applies, Kellar, 664 F.3d at 176, but it is the *plaintiff* who is moving for summary judgment and inferences on summary judgment are drawn in favor of the nonmoving party. There doesn't appear to have been a practical administrative difficulty recording the additional time and the screening was conducted daily. But it appears that determining the aggregate amount of

27

compensable time involved guesswork, because there is nothing in this record to support the calculations. The plaintiff makes many assumptions and draws inferences in her own favor. She may be able to produce sufficient evidence for a jury to find (or this court to rule) that the *de minimis* defense is not available, but at this time, the court declines to make such a ruling as a matter of law. The court will deny the plaintiff's motion for summary judgment in her favor on the *de minimis* defense.

        E.       <u>Meal Breaks</u>

              1.     *Parties' Arguments*

                     a.     Plaintiff's Brief (Dkt. No. 109)

The plaintiff next argues that breaks between five and twenty minutes must count as hours worked under the FLSA, but that *bona* fide meal breaks thirty minutes or longer need not count. Dkt. No. 109 at 16. The plaintiff insists that 29 C.F.R. §785.18 imposes a bright-line rule that meal breaks less than twenty minutes must count as hours worked under the FLSA. <u>Id.</u> She argues that the defendants are liable if they knew or had reason to know of the shortened meal breaks. <u>Id.</u> at 17 (citing <u>Allen v. City of Chicago</u>, 865 F.3d 936, 938 (7th Cir. 2017)). According to the plaintiff, the defendants had to know that the plaintiff's reported meal break was fifteen minutes when they relied on her punch in and punch out times to compute her hours worked. <u>Id.</u>

The plaintiff argues Wisconsin law dictates that breaks of less than thirty minutes should be counted as rest periods and included in hours worked. <u>Id.</u> She says that under DWD §272.12(2)(c)1 and 2, rest periods of less than thirty

minutes must count as hours worked whereas *bona fide* meal times of thirty minutes or longer are not work time. Id. at 18. The plaintiff asserts that the Department of WorkForce Development agrees with her interpretation of §§272.12(2) and 274(3) by providing that breaks need not be paid if they are longer than thirty minutes and the employee is completely relieved from duty and free to leave the premises. Id. (citing https://dwd.wisconsin.gov/er/laborstandards/breaks.htm.). The plaintiff reasons that rest periods shorter than thirty minutes always are compensable, so meal periods comprising less than a full thirty-minute break must count as hours worked. Id. at 19.

The plaintiff acknowledges that one of the court's colleagues, Judge William C. Griesbach, disagrees with her analysis and has ruled that breaks lasting fewer than thirty minutes need not be counted as time worked if the employee was permitted to take a full thirty minutes for the break. Id. at 18-19 (citing Wirth v. RLJ Dental, S.C., Case No. 18-C-910, 2022 WL 356030, *4 (E.D. Wis. 2012)). She argues that Judge Griesbach got it wrong and insists that the Wisconsin Supreme Court would attempt to harmonize §§272.12(2)(c) and 274.02(3) to avoid a conflict (meaning that any period less than a full thirty minutes must count as hours worked). Id. at 19. The plaintiff argues that §274.02(3) should apply only to meal periods of thirty minutes or longer and therefore would not affect the rest periods discussed in §272.12(2)(c)1. Id. She adds that even if the court follows Judge Griesbach's lead, the court should follow California law, which creates a rebuttable presumption of liability. Id. at 20 (citing Donohoe v. AMN Services, LLC, 11 Cal. 5th 58, 78-79 (2021). Under

California's approach, the claim that an employee waived a meal break by choosing to work when it was not required presents an affirmative defense upon which the employer bears the burden of proof. Id. The plaintiff claims that in discovery, she asked the defendants to identify all evidence indicating that, on any occasion on which she punched in less than thirty minutes after she punched out for a meal break, she chose to work that portion of the thirty minutes; she says the defendants failed to provide a response. Id. at 21.

        b.     Defendants' Response (Dkt. No. 119)

The defendants argue that meal breaks less than twenty minutes are not always compensable under the FLSA. Dkt. No. 119 at 11. For example, *bona fide* meal breaks do not include coffee breaks or time for snacks. 29 C.F.R. §785.19. They argue that a *bona fide* meal break is time when an employee is "completely relieved of duty for the purposes of eating regular meals. Id.

The defendants recount that the official meal break policy for Cudahy Place states:

> Full-time employees are allowed thirty (30) minutes for a meal period. The meal period is non-work time and is unpaid. You must sign out and then back in on your time sheet to record your meal period. The thirty (30) minutes for your meal time will be deducted from your worked hours. If you leave the community you must clock out and clock back in at the end of your meal break. Employees must receive advance approval from their supervisor to work during part or all of a scheduled meal period. All meal periods will be scheduled by your supervisor. Meal periods for employees working less than full-time should be arranged with your supervisor.

Dkt. No. 119 at 13 (citing Dkt. No. 57-2 at 30). The defendants argue that the plaintiff has the burden of establishing that the breaks are compensable. Id.

With respect to Wisconsin law, the defendants rely on Judge Griesbach's decision in Wirth finding that breaks of fewer than thirty minutes need not be counted as hours worked if the employee was offered a full thirty minutes. Id. at 14 (citing Wirth, 2022 WL 356030 at *2). The defendants note that 29 C.F.R. §785.19 says "[b]ona fide meal periods are not worktime" and the corresponding Wisconsin regulation says "[b]ona fide meal *periods of 30 minutes or more* are not work time." Id. at 14-15 (citing Wis. Admin Code DWD §272.12(2)(c)2).

c.     Plaintiff's Reply (Dkt. No. 123)

The plaintiff replies that under the FLSA a meal break of twenty minutes is too short to qualify as a *bona fide* meal period and that, as a matter of law, her fifteen-minute meal breaks are compensable. Dkt. No. 123 at 2. According to the plaintiff, the Seventh Circuit has held that a meal break is not *bona fide* and must count as hours worked if it is too short to permit the employee to eat a meal without getting indigestion. Id. at 12 (citing Mitchell v. JCG Industries, 745 F.3d 837, 845 (7th Cir. 2014)). She reiterates that the court should apply a bright-line rule, consistent with 29 C.F.R. §785.18, that breaks of less than twenty minutes are compensable though the employee performed no work during the breaks. Id. at 13.

With respect to Wisconsin law, the plaintiff argues that DWD §272.12(2)(c)1 unambiguously states that rest periods running less than thirty minutes must be counted as hours worked. Id. at 14. She adds that the defendants have failed to present any evidence to show that the plaintiff was

31

relieved from duty for a full thirty minutes, so the plaintiff was entitled to be paid for her on-duty meal periods. Id. at 15-16.

2.     Analysis

The plaintiff begins with the Department of Labor regulation stating that "[r]est periods of short duration, running from 5 minutes to about 20 minutes . . . must be counted as hours worked." 29 C.F.R. §785.18. She reasons that a meal break shorter than twenty minutes is not enough time to eat and therefore must be considered a compensable rest period. The court has not located any Seventh Circuit authority holding that meal breaks of twenty minutes or less are not meal breaks but rather rest periods under the regulatory standard.

There is a second regulation addressing meal periods. That regulation states:

> (a) Bona fide meal periods are not worktime. Bona fide meal periods do not include coffee breaks or time for snacks. These are rest periods. The employee must be completely relieved from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period. A shorter period may be long enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating.

29 C.F.R. § 785.19(a). This regulation distinguishes between rest periods and time devoted to regular meals. It also provides that a shorter period may be long enough to constitute a meal period under special conditions.

Once again, there is a relative dearth of evidence in the record. The policy in the employee handbook required employees to get permission from their supervisor to take a meal break less than thirty minutes. There isn't any

32

testimony in the record about whether this did or did not occur. The plaintiff has offered no evidence that she often worked through meals or returned to work in less than fifteen minutes beyond her punch times.

The Seventh Circuit has looked at this issue under the Wisconsin regulatory scheme and affirmed Judge Griesbach's ruling in <u>Wirth</u>:

> Our analysis begins and ends with the plain language of the regulatory scheme, which distinguishes between compensable rest periods and non-compensable meal periods. *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1091 (7th Cir. 1999) (citing *State ex. rel. Jacobus v. State*, 208 Wis. 2d 39 . . . (1997)). The Wisconsin Department of Workforce Development provides that employees "must be paid for all time spent in physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer's business." Wis. Admin. Code, Dep't of Workforce Dev. § 272.12(1)(a)(1). Employees must also be paid for "rest periods of short duration[,]" which are defined as breaks of less than 30 minutes. *Id.* at § 272.12(2)(c)(1). Wisconsin law distinguishes rest periods from meal periods. Meal periods of 30 minutes or more during which employees are completely relieved from duty for the purposes of eating regular meals are not compensable. *Id.* at § 272.12(2)(c)(2).
>
> Wirth attempted to transform her non-compensable meal period into a compensable rest period by clocking back in after less than 30 minutes, despite what her employer provided and her employer's repeated instruction to take her full break. Wirth wants us to focus on her conduct—the fact that she elected to take a lunch break of less than 30 minutes. But this focus is misplaced. The Wisconsin regulatory scheme focuses on what the employer provided, not what the employee elected. Because RLJ provided 30 minutes or more during which Wirth was completely relieved from duty for the purposes of eating lunch, RLJ was not obligated under the law to pay her for the time she was off the clock.

<u>Wirth v. RLJ Dental, S.C.</u>, 59 F.4th 270, 272 (7th Cir. 2023). Because the regulatory scheme distinguishes between rest and *bona fide* meal periods and

because there is no evidence regarding what was offered to the plaintiff, the court declines to enter summary judgment for the plaintiff on this issue.

## II.    Plaintiff's Expedited Motion for Reconsideration (Dkt. No. 115)

A.    Plaintiff's Brief (Dkt. No. 115)

The court certified the two collectives on September 30, 2022. Dkt. No. 113. On October 11, 2022, the plaintiff filed a motion under Rule 54(b) asking the court to reconsider the part of that ruling in which the court concluded that the notice to putative class members should advise them that the notice was directed to all hourly employees who worked at a Wisconsin facility operated by 41 Management between January 13, 2018 and January 13, 2021. Dkt. No. 115 at 1. The plaintiff argues that, under 29 U.S.C. §256(b), an opt-in member of a collective class "commences" his suit when he files his written consent and §255(a) allows collective members to recover for the three-year-period before they "commence" their suits. Id. at 2-3 (citing Groshek v. Babcock & Wilcox Tubular Products Div., 425 F. Supp. 232, 234 (E.D. Wis. 1977); Kim v. Capital Tech Lab, Inc., 279 F. Supp. 3d 765, 770 (N.D. Il. 2017); Powers v. Centennial Communications Corp., Case No. 08-cv-208, 2010 WL 746776, *3 (N.D. Ind. 2010); Mitchell v. Trilliant Food and Nutrition, LLC, Case No. 19-C-147, 2020 WL 1181945 (E.D. Wis. 2020)). The plaintiff argues that the court should have allowed the collective members to recover for the three years before their written consents were filed with the court, rather than the three years before January 13, 2021 (when she filed the first amended complaint). Id. at 3. She asserts that "[b]y allowing collective members to recover between

34

January 13, 2018 and January 13, 2021, the Court erroneously treated collective members' claims as having commenced when the Complaint was filed. Since the Court's ruling must follow [29 U.S.C.] §256(b), which provides that collective members' claims commence when their written consent is filed with the Court, the Court's ruling is a manifest error of law that can be corrected on a motion for reconsideration." Id.

The plaintiff did not raise this argument in her motion for certification of the collective. The plaintiff implicitly concedes this when she argues that the court can consider new arguments when being asked to reconsider an interlocutory order. Id. (citing United Airlines, Inc. v. ALG, Inc., 916 F. Supp. 793, 795 (N.D. Ill. 1996)). The plaintiff asserts that reconsideration is appropriate "because otherwise collective members would be deprived of the right to recover for close to two years (between January 13, 2021 and the opt-in date)." Id. She maintains that each new paycheck failing to pay all overtime pay required by the FLSA leads to an accrual of a new cause of action and that "judicial resources would be wasted if opt-ins are required to file a second lawsuit to recover overtime pay that accrued after their first written consents were filed with the Court." Id. at 3-4.

The plaintiff asks the court to insert the following paragraph between the current two paragraphs in the section titled "Effect of Joining Lawsuit":

> If you timely opt into the lawsuit, you will potentially be eligible to recover for a period starting three years before your opt-in date and ending on the date that your opt-in form is filed with the Court. If you wish to recover for the time period after your opt-in form is filed with the Court, you may submit a new opt-in form every six months to the same address that you mailed the first opt-in to.

35

Id. at 4. The plaintiff does not identify the document into which the court should insert this paragraph, but the court assumes she wishes the court to insert it into Dkt. No. 94-2, the proposed Notice of Pendency of Lawsuit. Presumably the plaintiff wants the language inserted on page 3, between the two paragraphs under the heading, "EFFECT OF JOINING THIS LAWSUIT." Dkt. No. 94-2 at 3.

B.     Defendants' Response (Dkt. No. 118)

The defendants respond that plaintiff has failed to identify a manifest error of law or present newly discovered evidence. Dkt. No. 118. They recount that the court calculated the three-year notice period from the date Chief Judge Peterson granted the plaintiff leave to amend the complaint and accepted the amended complaint. Id. at 2 (citing Dkt. Nos. 27, 28). They point out that in ordering the plaintiff to modify the notice to add an end date of January 13, 2021, this court explained that the plaintiff, "[w]ithout citing any law," had argued that the statute does not impose any limitation on the latest time that an FLSA claim can seek redress and argued that the collective members could seek redress up to the present day. Id. at 3. The defendants argue that the plaintiff should have included in her previous motion the case law she now includes in the instant motion. Id. at 3. The defendants assert that other courts that have used the three-year period from the date of the filing of the complaint, citing Bittencourt v. Ferrara Bakery & Cafe, Inc., 310 F.R.D. 106, 116-17 (S.D.N.Y. 2015); Castillo v. P & R Enters., 517 F. Supp. 2d 440, 449 (D.D.C. 2007). Id. at 3-4.

C.    <u>Analysis</u>

"Rule 54(b) governs non-final orders and permits revision at any time prior to the entry of judgment . . . ." <u>Galvan v. Norberg</u>, 678 F.3d 581, 587 n.3 (7th Cir. 2012). Reconsideration is appropriate in very few contexts, such as where the court has "patently misunderstood a party," "has made an error not of reasoning but of apprehension" or where there has been a "controlling or significant change in the law or facts since the submission of the issue to the Court." <u>Bank of Waunakee v. Rochester Cheese Sales, Inc.</u>, 906 F.2d 1185, 1191 (7th Cir. 1990). "[T]he court will grant a motion under Rule 54(b) only when necessary to correct manifest errors of law or fact or to present newly discovered evidence." <u>Collins Bey v. Ashworth,</u> Case No. 17-cv-784, 2022 WL 522995, at *4 (W.D. Wis. Feb. 22, 2022). A manifest error of law is the "wholesale disregard, misapplication, or failure to recognize controlling precedent." <u>Oto v. Metro. Life Ins. Co.</u>, 224 F.3d 601, 606 (7th Cir. 2000).

In her brief in support of conditional certification, the plaintiff stated:

> For the reasons argued in subsection 1d above,[2] the time period for the meal deduction claim should start on January 13, 2018; while the time period for the COVID screening claim should start in March of 2020. 29 U.S.C. §255 defines the latest date that a FLSA claim may be filed, but does not restrict a Plaintiff's right to recover additional damages for the time period after a FLSA claim was filed. Similarly, on the proposed collective claims Plaintiffs can recover damages to the present date.

Dkt. No. 95 at 20. The plaintiff cited no case law for her assertion that §255 does not restrict a plaintiff's right to recover damages for the period

---

[2] There was no "subsection 1d" in the plaintiff's motion for conditional certification.

after she files an FLSA claim, or for the proposition that plaintiffs can recover damages "to the present date."

In opposing the motion for conditional certification, the defendants pointed out that while the plaintiff's proposed notice to the collective was addressed to employees who worked at a Wisconsin facility operated by 41 Manufacture "during the time period on or after January 13, 2018" (Dkt. No. 94-2 at 1), the notice did not include a cut-off date. Dkt. No. 103 at 13. They argued that because §255 established, at most, a three-year limitation period, the notice should include a "cut-off date" three years after January 13, 2018— January 13, 2021. Id. The plaintiff responded by repeating what she'd said in her opening brief—that §255 does not "impose any limitation on the latest time that a FLSA claim can seek redress for." Dkt. No. 105 at 14 (and Dkt. No. 95 at 20). She reiterated that collective members could recover damages "up to the present day." Dkt. No. 105 at 14. Again, the plaintiff did not cite any statutory authority or case law supporting this proposition.

In ruling on the motion for conditional certification, the court reproduced the language of §255, which states that an FLSA cause of action must be "commenced" within two years "after the cause of action accrued," unless the defendant willfully violated 29 U.S.C. §219(b), in which case the complaint must be "commenced" within three years after the cause of action accrued. Dkt. No. 34 at 34. Despite the plaintiff not having cited it, the court turned to §256 for the definition of "commences," as used in §255, and observed that §256 says that the lawsuit is considered to commence on the date that a

38

complaint is filed, *unless* the case is a collective or class action. Id. at 35. It quoted §256(b), which says that an FLSA cause of action "commences" for *putative collective or class members* "on the subsequent date on which" the putative class member files his or her written consent with the court. Id. The court then cited the Seventh Circuit's decision in Smith v. Professional Transportation, Inc., 5 F.4th 700, 703 (7th Cir. 2021), in which that court said (after quoting §256) that "if the written consent requirement [of §256(b)] applies, plaintiffs seeking to be represented in the collective action need to file the written consent within [the two or three-year limitation period specified by §255(a)]." The court relied on this language from Smith—that putative collective members needed to file their written consent within the two- or three-year limitation period—in holding that the notice of suit should advise putative class members that they could opt in if they worked at a 41 Manufacture Wisconsin facility between January 13, 2018 and January 13, 2021.

In her motion to reconsider, the plaintiff now argues that "[u]nder 29 U.S.C. §256(b), opt-in plaintiffs' claims commence when their written consents are filed with the Court." Dkt. No. 115 at 1. That is correct. That is what the statute says, and what the court said in its order ruling on the motion for conditional certification. But the plaintiff did not argue this, or cite §256(b), in her motion for conditional certification. The plaintiff also now argues that

> [b]ecause 255(a) allows collective members to recover for the three years before their claims commence, collective members can recover for the three years before their written consents are filed with the Court, rather than the three years before the First Amended Complaint was filed on January 13, 2021.

39

Id. This, too, appears to be correct, as the court will explain below. But again, the plaintiff did not argue this in her motion for conditional certification. This is a new argument, which means that the court's conclusion that the three-year limitation period ran from January 13, 2018 to January 13, 2021, and that class members should receive notice that they could opt in if they worked at one of 41 Manufacture's Wisconsin facilities during that period, did not result from the court "patently misunderstanding" the plaintiff. The plaintiff is using a motion to reconsider to make an argument that she could have made in the motion for conditional certification, which the Seventh Circuit has held is an inappropriate use of a motion to reconsider. Caisse Nationale de Credit Agricole v. CBI Indus., Inc., 90 F.3d 1264, 1270 (7th Cir. 1996).

Nor is the plaintiff's motion to reconsider based on newly discovered evidence. It appears that, after the court set a cut-off date as requested by the defendants, the plaintiff realized that she had failed to raise the argument, which caused her to file this motion for reconsideration.

The court could deny the motion to reconsider on that basis. But the court is concerned that it *has* misconstrued the calculation of the three-year limitation period and that the language it proposed to insert into the notice of suit does not accurately reflect the law.

In her motion for conditional certification, the plaintiff made three assertions: (1) that the "time period for the meal deduction claim should start on January 13, 2018," (2) that 29 U.S.C. §255 "does not restrict a Plaintiff's right to recover additional damages for the time period after a FLSA claim was

40

filed," and (3) that "on the proposed collective claims Plaintiffs can recover damages to the present date." Dkt. No. 95 at 20. With regard to the first assertion—that the "time period" for the meal deduction claim "should start on January 13, 2018," it appears that the plaintiff read §256(b)'s statement that an FLSA suit "commences" on the date the complaint was filed, observed that her amended complaint was filed on January 13, 2021, looked at §255(a)'s requirement that a suit be "commenced" within three years of the date the cause of action accrued and subtracted three years from the date the amended complaint was filed to come up with what she called a "start" date of January 13, 2018. The plaintiff's use of the words "start date," and her identification of a specific date, were misleading; upon reflection, the court believes that the plaintiff (and the court) confused the "commencement" date of a lawsuit with the *accrual* date of the cause of action.

The plaintiff's proposed notice of suit advised putative class members that they were receiving the notice because they worked at a Wisconsin facility administered by 41 Management "during the time period of January 13, 2018 to the present." Dkt. No. 94-2 at 2. At the time the plaintiff filed the proposed notice, "the present" was January 20, 2022—four years after the January 13, 2018 date identified in the notice. The defendants objected that the notice "encompass[ed] a time period from January 13, 2018 through the present, a time period that is greater than the maximum three-year statute of limitations under the FLSA." Dkt. No. 103 at 13 (citing §255(a)). The defendants assumed—probably based on the plaintiff's use of the words "start date" and

the identification of a specific date—that for *all* plaintiffs, the three-year limitation period applicable to willful violations would "start" to run on the plaintiff's so-called "start date" of January 13, 2018.

The plaintiff responded that "there is no rule that under 29 U.S.C. §255(a) class members can recover damages for no more than three years." Dkt. No. 105 at 14. She repeated her second and third assertions from the motion—that "§255(a) does not impose any limitation on the latest time that a FLSA claim can seek redress for" and that "[m]embers of the collective therefore may recover damages up to the present day unless Defendants have changed their policies to correct the practices the Plaintiff complaints [sic] of . . . ." Id. The plaintiff responded to the defendants' argument that the three-year limitation period should run from January 13, 2018 to January 13, 2021 by arguing that class members could recover more than three years of damages— a different argument—and by arguing that class members could continue to recover damages "to the present day"—also a different argument.

Confused by these arguments, the court set a fixed, date-specific three-year period for which putative collective members could recover. The court erred in doing so. Section 255(a) requires a plaintiff to "commence"—to start or file—her FLSA lawsuit within either two (non-willful violations) or three years (willful violations) of the date on which her cause of action accrues. Section 256 explains how one "commences" an FLSA lawsuit: a *named plaintiff* "commences"—starts—her lawsuit when she files the complaint. In this case, named plaintiff Harwell-Payne "commenced" her lawsuit on January 13, 2021.

42

A *putative member of a collective or class*, however, "commences"—starts—her lawsuit when she files her opt-in notice. To date, none of the putative collective members have "commenced" their lawsuits; they have not yet filed their written opt-in consents, because they have not received notice of the suit.

Section 256(b) explains *how* a plaintiff must commence her FLSA lawsuit. But to determine *when* a plaintiff must "commence" her lawsuit, we return to §255(a), which tells us that regardless of how a plaintiff "commences" an FLSA suit, each individual plaintiff must commence her or his suit within three years "after the cause of action accrued" (if the violation was willful), or within two years after the cause of action accrued (if the violation was not willful). To determine the last date on which a plaintiff may "commence" her lawsuit, then, one must determine when her cause of action "accrued." The plaintiff filed her amended complaint on January 13, 2021—if her meal break cause of action "accrued" more than three years before that date, the complaint is time-barred.[3] To be timely, a putative opt-in plaintiff's meal-break cause of action must have "accrued" within three years (two, if the violation was not willful) of the date on which the opt-in plaintiff files with the court her written consent to opt in.

Section 255 applies to actions "to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under

---

[3] Notably, the second amended complaint—now the operative pleading—alleges "[t]roughout the entirety of Plaintiff's period of employment, 41 Management" deducted the full duration of her meal breaks even if they were less than thirty minutes. Dkt. No. 87 at ¶¶20-22. But it does not state when the plaintiff began to work at Cudahy Place or when she stopped working there.

43

the Fair Labor Standards Act of 1938 . . . ." 29 U.S.C. §255. The district court

for the Northern District of Indiana has held that a cause of action for overtime

pay "accrues when the employee received less than required by FLSA . . . ."

McColley v. Casey's General Stores, Inc., 627 F. Supp. 3d 972, 981 (N.D. Ind.

2022). The Northern District of Illinois has explained that

> Ordinarily, "a cause of action under the Fair Labor Standards Act
> for unpaid minimum wages or unpaid overtime compensation and
> for liquidated damages 'accrues' when the employer fails to pay the
> required compensation for any workweek at the regular pay day for
> the period in which the workweek ends." 29 C.F.R. 790.21.

Dougherty v. City of Chicago, Case No. 15 C 10975, 2020 WL 6508861, at *8

(N.D. Ill. Nov. 5, 2020). See also, Young Chul Kim v. Capital Dental Tech. Lab.,

Inc., 279 F. Supp. 3d 765, 769 (N.D. Ill. 2017) (stating that FLSA unpaid

overtime claim accrued "the date that the overtime payment became due"). It

appears, then, that a plaintiff's FLSA cause of action "accrues" on the last date

on which the employer fails to pay that employee the overtime required by the

statute. That means that a plaintiff must "commence" her lawsuit within two or

three years of the last date on which her employer failed to pay her the

overtime due under the statute.

So—the plaintiff's assertion in her motion for conditional certification

that the "period" for the meal deduction claim "should start on January 13,

2018" makes little sense. The *plaintiff* was required to file her meal-deduction

claim within three years (two if the violation was not willful) of the last date on

which the defendant allegedly failed to pay her for a compensable break. (The

court has no way of knowing whether she did so—the complaint does not

44

identify that date.) The plaintiff's reasoning—that her January 13, 2021 amended complaint was timely filed and thus that the three-year limitation period "started" three years earlier, on January 13, 2018—assumes that she filed her January 13, 2021 complaint within three years of the last date on which the defendant allegedly failed to pay her for a compensable meal break. Even if that assumption is true, it does not follow that there is a set "period" for meal-deduction claims that applies to *all* plaintiffs, or that that period "started" on January 13, 2018. All the court can determine with certainty is that because the plaintiff filed her amended complaint on January 13, 2021, *she* may seek to recover for any alleged violations that occurred between January 13, 2018 and January 13, 2021.

Considered in this light (as the court should have done when it ruled on the motion for class certification), the defendants' argument that the court should set a "cut-off date" of January 13, 2021 also doesn't make sense. Just like the plaintiff, a putative collective plaintiff must "commence" her lawsuit within three years (if willful) of the last date on which the defendant allegedly failed to pay her for a compensable meal break. If a putative collective plaintiff's cause of action "accrued" on January 4, 2021 (let's say that's the date she began working, and the first date on which he was not paid for a compensable meal break), she must file with the court her written consent to opt in—in other words, she must "commence" her lawsuit—by January 4, 2024. She does not have a "cut-off date" of January 13, 2021. While the defendants are correct that the limitation period for willful violations is three years, it is a *different*

45

three-year period for the named plaintiff and each of the putative collective action plaintiffs.

The issue is not whether there is a single date on which the meal-break limitation period for all plaintiffs "starts," or whether there is a single date on which the meal-break limitation period for all plaintiffs "ends." The issue is whether each plaintiff "commenced" the FLSA action within three years of the date that that individual plaintiff's meal-break claim "accrued." The notice of suit should advise putative plaintiffs that they are receiving the notice because they have worked at a Wisconsin facility administered by 41 Management within the past approximately three years, because they may recover only for an violations that occurred within the three years prior to the date on which they file their written consent forms with the court and they cannot do so until the notice goes out.

The plaintiff's arguments that "§255(a) does not impose any limitation on the latest time that a FLSA claim can seek redress for" and that "[m]embers of the collective therefore may recover damages up to the present day" also muddied the water. In hindsight, the court suspects that what the plaintiff meant by these statements was that opt-in plaintiffs have the ability to file their written consents at any point before the deadline set in the notice of suit, based on events that occurred in the three years prior to their filing of that written consent with the court. As of the date the plaintiff filed her brief in support of conditional certification, no putative collective plaintiffs had filed any notices. Had the plaintiff sent out the notice that very day, putative class

46

plaintiffs who were exposed to violations on that day that could have sought redress for those violations. If that is what the plaintiff meant, she is correct—a putative collective plaintiff may be subjected to actionable violations up to the moment he files with the court his written consent to opt in to the collective.

The plaintiff's motion to reconsider is not proper because it asks the court for reconsideration based on arguments she did not make in her motion for conditional certification. But the court got it wrong in setting a fixed, date-based three-year period in the notice of suit. The court has reconsidered, and will modify its September 30, 2022 order. Dkt. No. 113 at 56. It will order the plaintiff to modify the notice to the collective class to advise putative class members that they are receiving the notice because they worked at a Wisconsin facility administered by 41 Management during the three-year period prior to the date on which opt-in plaintiffs will file their written consents with the court.

### III. Plaintiff's Motion for Leave to Reopen Discovery (Dkt. No. 116)

A. <u>Plaintiff's Brief</u> (Dkt. No. 117)

The plaintiff asks the court to reopen discovery "for good cause" for two reasons. Dkt. No. 117 at 1. First, the plaintiff argues that she "needs time and payroll records for opt-in plaintiffs to defend against" the motion for certification[4] of the FLSA collective. <u>Id.</u> The plaintiff insists that it was not possible "to obtain such time and records before the close of discovery" because the court granted the motion for conditional certification after the close of

---

[4] The court assumes the plaintiff is concerned about a motion for decertification, given that as the party seeking certification of the collective, she'd have no need to defend against that certification.

discovery. Id. The plaintiff claims that she could not have known who would opt into the collective action and so had no way to limit her requests. Id. at 3. Second, the plaintiff argues that 41 Management has refused to provide any information for employees at facilities other than the Cudahy Place. Id. at 1. The plaintiff argues that she needed the court's decision denying without prejudice her motion for class certification to demonstrate that she needed additional discovery to satisfy the commonality and typicality requirements of Rule 23. Id. at 5.

B.    Defendants' Response (Dkt. No. 122)

The defendants oppose the motion to reopen discovery because the plaintiff did not attempt to obtain time and payroll records for other potential collective members before conditional certification and has not demonstrated the necessary diligence to support a finding of good cause. Dkt. No. 122 at 1-2. The defendants cite Rule 16(b)(4), which provides that a schedule may be modified only for good cause shown and with the court's consent. Id. They emphasize that the initial discovery deadline was extended to August 19, 2022 after the court approved the stipulation of the parties. Id. at 3-4. The defendants maintain that the plaintiff made no attempt to get the information before the close of discovery and has not demonstrated the diligence necessary for good cause to reopen discovery. Id. at 4-5.

C.    Plaintiff's Reply (Dkt. No. 127)

The plaintiff insists that the defendants are wrong in asserting that she could have obtained time and payroll records for potential class members

48

during the limited discovery permitted before conditional certification. Dkt. No. 127 at 1. She argues that she had no right to time and payroll records before the court granted conditional certification after the close of discovery. Id. The plaintiff insists that she had no way of knowing who would opt in prior to the close of discovery and that the defendants' responses made clear they would not voluntarily produce such information. Id. at 2-3. The plaintiff points out that the defendants objected to narrower requests, such as why the defendants could not have employees punch in on their phones before starting COVID screening, why employees could not handwrite their start times before starting the screening, where the clocking-in devices were located at each facility and the distance between the screening area and punch clock. Id. at 3. The plaintiff says that the defendants consistently took the position that such discovery was premature and that they would not answer interrogatories for any facility other than Cudahy Place. Id. According to the plaintiff, numerous courts limit pre-conditional certification collective discovery to the names and contact information of potential collective members. Id. at 4 (citing Muir v. Guardian Heating & Cooling Services, Inc., Case No. 16 C 9755, 2017 WL 959028, *10 (N.D. Ill. 2017); Spack v. Trans World Entertainment Corp., Case No. 17-CV-1335, 2019 WL 587908, *5 (N.D. N.Y. 2019)). The plaintiff asks the court to reopen discovery without any restrictions until 30 days after the opt-in deadline for the conditionally certified collective action. Id. at 7.

D.    Analysis

The court finds good cause to reopen discovery. While the court has delayed (inexcusably) in ruling on the current motions, the litigation also has been delayed by the sheer number of motions filed. The court has allowed the plaintiff to file three complaints, the defendants to file three rounds of motions to dismiss and the plaintiff to file multiple motions for class certification. It has extended the discovery deadline at the parties' request. Motions for class certification were due on February 17, 2022. Dkt. No. 101. Discovery closed on August 19, 2022. Id. Dispositive motions and a motion to decertify the collective were due on September 16, 2022, id., but the court didn't grant the conditional motion for certification of the collective until September 30, 2022, dkt. no. 113. With all that water under the bridge, the plaintiffs still have not been able to obtain discovery on the payroll records and time sheets for members of the collective who opt in (given that their identities are not known).

As for the plaintiff's request to reopen discovery for the purpose of bringing another motion under Rule 23, the court will deny that request. The plaintiff filed a motion to determine the adequacy of responses on March 29, 2021, dkt. no. 54, which the court denied without prejudice because the plaintiff had made no attempt to meet and confer, dkt. no. 89. The plaintiff never filed a motion to compel regarding discovery that sought information about a prospective class. The plaintiff never asked the court to extend the deadline for filing a Rule 23 motion and has filed three motions to certify the class under Rule 23. Dkt. Nos. 55, 73, 96. The court denied the first and

50

second motions without prejudice—the plaintiff tried to certify a class against a defendant who had not yet appeared in the litigation (41 Management). Dkt. No. 89. The court denied the third motion to certify the class because the plaintiff had not shown commonality or typicality. Dkt. No. 113.

The court will require the parties to confer and file a joint status report. Specifically, the parties should try to agree on a new deadline for completing discovery and a new deadline for the defendants to file a motion to decertify the FLSA collective (if they choose to do so). The parties have not asked for additional time to file dispositive motions. The previous deadline was September 16, 2022, and the plaintiff filed her summary judgment motion on that date (Dkt. No. 108). The defendants did not request summary judgment or ask for additional time to do so. So there is no need for the parties to identify a new dispositive motion deadline. After the court decides any motion to decertify the FLSA collective, the court will confer with the parties to set dates for a final pretrial conference and trial.

## IV. Final Thoughts

The last of the motions addressed in this order was fully briefed as of November 15, 2022—over sixteen months ago. The court should have ruled on these motions long before now. Much of that delay was entirely the fault of the undersigned. But some of the delay was the result of the tangle of motions, responses and replies filed since the court's September 2022 ruling. It is time for this case to move past the preliminary stages. The parties now have the court's rulings on the legal issues the plaintiff has raised. What remains is for

51

the plaintiff to send out notice to the collective, the parties to complete discovery and the defendants to file their decertification motion (if they choose to do so). The court cannot identify a need for any other motions.

## V.    Conclusion

The court **GRANTS IN PART** the plaintiff's motion for summary judgment. Dkt. No. 108. The court **GRANTS** the motion to the extent that it asks the court to find, as a matter of law, that the time spent to do the COVID-19 screening was indispensable and integral to work as a Med Aide. The court **DENIES** the motion in all other respects.

The court **GRANTS** the plaintiff's motion for the court to reconsider the language in the notice of suit. Dkt. No. 115.

The court **MODIFIES** page 56 of its order at Dkt. No. 113. The court **ORDERS** that the plaintiff must modify the notice to the collective class as follows:

In the "TO" section at the top of Page 1, modify the language to read: "All hourly employees who worked at a Wisconsin facility operated by 41 Management, LLC during the three-year (3) period preceding the date of this notice." Dkt. No. 94-2 at 1.

In the "YOUR RIGHT TO PARTICIPATE IN THIS SUIT" section on Page 2, modify the first line to read: "You are receiving this notice because you worked at a Wisconsin facility administered by 41 Management during the three years prior to the date of this notice." Dkt. No. 94-2 at 2.

In the "EFFECT OF JOINING THIS LAWSUIT" section on Page 3, insert between the two paragraphs the following language: "If you return your signed Consent Form by the deadline stated in the "HOW AND WHEN TO JOIN THE SUIT" section above, potentially you will be eligible to recover for a period starting three years before you file your written Consent Form with the Court."

The court **GRANTS IN PART** the plaintiff's motion for leave to reopen discovery for the limited purpose of conducting discovery relating to the members of the collective class. Dkt. No. 116.

The court **ORDERS** that by the end of the day on **May 10, 2024**, the parties must file a joint status report advising the court of the status of the sending of the notices, the agreed-upon deadline for completing discovery and the deadline for the defendants to file a decertification motion. The court **ORDERS** that if the parties are unable to agree on these dates, the status reports should describe the positions of the respective parties as to each date.

Dated in Milwaukee, Wisconsin this 28th day of March, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

53